**Opinion issued February 7, 2017**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00996-CR

———————————

**KEYDRIN ARCENEAUX, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Case No. 1486680**

---

## MEMORANDUM OPINION

A jury convicted appellant, Keydrin Arceneaux, of reckless injury to a

child.[1] After he pleaded true to enhancement paragraphs, the jury assessed his

---

[1]    *See* TEX. PENAL CODE ANN. § 22.04 (West Supp. 2016).

punishment at seventy-five years' confinement.[2] In three issues, appellant argues that (1) the evidence was insufficient to support his conviction; (2) the trial court erred in allowing evidence of an extraneous offense; and (3) the trial court erred in refusing to charge the jury on the lesser-included offense of negligently causing bodily injury to a child.

We affirm.

## Background

The complainant is K.J., a girl who was five months old at the time of her death. K.J.'s mother, Laquisha Jackson, had begun dating appellant after she became pregnant with K.J. Before Jackson gave birth to K.J., she and appellant moved into a two-bedroom apartment with appellant's father and appellant's father's girlfriend. After K.J.'s birth, Jackson continued to live with appellant, and appellant sometimes helped her care for both K.J. and K.J.'s older sister.

On January 9, 2013, Jackson took K.J. to the emergency room because she had been suffering from an eye infection and nasal congestion that had appeared to worsen. The emergency room doctor described K.J. as appearing alert and normal, aside from the eye infection and congestion. Jackson returned home at approximately 3:30 a.m. and put K.J., who was sleeping, in her bassinet. K.J. later

---

[2] *See id.* § 12.42(b) (West Supp. 2016) (providing punishment range for repeat and habitual offender convicted of second-degree felony with prior felony convictions); § 22.04(e) (providing that reckless injury to child is second degree felony).

woke up. Appellant offered to feed her a bottle and eventually left the room with K.J. At approximately 9:00 a.m., appellant woke Jackson to tell her he was leaving for the day. As he left, Jackson checked on K.J. and found that she was not breathing. Despite efforts to revive her by the Baytown Fire Department, Baytown EMS, and personnel from the emergency room at San Jacinto Hospital, K.J. was officially pronounced dead at 10:31 a.m. Appellant was charged with recklessly causing serious bodily injury to a child in connection with K.J.'s death. The indictment alleged that he recklessly caused serious bodily injury to K.J. by shaking her with his hands or by striking her against a blunt object.

At appellant's trial, Jackson testified regarding the events of January 8 and 9, 2013. On January 8, 2013, Jackson took K.J. to her pediatrician, Dr. Maryam Taghadosi, because K.J. had congestion in her eyes and nose. The pediatrician prescribed an eye cream and warned Jackson to take K.J. to the emergency room if she seemed to be having an allergic reaction. Later that night, Jackson observed that K.J.'s left eye was swollen, so she took K.J. to the emergency room where she was seen by Dr. Robert Panzarella.

Both Taghadosi and Panzarella testified at trial that K.J. appeared alert and was a happy, normal baby with an eye infection and congestion. Panzarella testified that when he examined K.J., she was alert, sitting upright, and playing. Neither doctor saw any sign of injury.

3

Jackson and K.J. returned home at approximately 3:30 a.m. on January 9, 2013, and Jackson put K.J. to bed. K.J was fussy because she was hungry, and appellant offered to feed her. Jackson testified that, at one point, she observed appellant sitting with K.J. at the edge of the bed and she asked him if everything was okay. Appellant told her that he could not get K.J. to burp. Jackson stated that she told appellant to stand up and walk around with K.J., and appellant told her he would take K.J. to the other room so Jackson could get some sleep. Jackson saw him leave the room with K.J. and then fell back asleep. Jackson did not hear appellant come back in the room or lay K.J. in her bassinet, but she woke up later and noticed that appellant was in the bed beside her.

At approximately 9:00 a.m., appellant woke Jackson just before he left the apartment for the day. As appellant left, Jackson checked on K.J. and discovered she was not breathing. Jackson ran out the door to try to catch appellant, and she called him to tell him to return home. She then called 9-1-1 and attempted to resuscitate K.J. When the paramedics arrived, they took over care for K.J. Jackson testified that she could not understand what had happened and that she had examined K.J. looking for any sign of injury or explanation. Before she left the home with the paramedics and K.J., she asked appellant, who had returned home by this point, what had happened earlier that morning:

> I said, Did you feed her right? Like, What happened? You know, Was she able to burp? Did you burp her right? What happened whenever

4

you went in the living room? Did you bump her head against something? Did you have a seizure?

And he was just, like, No, no, no, no. You know, I did burp her, she didn't drink all her bottle, you know.

I said, Well, did you lay her down right? . . . . He said, I laid her down on her side and she must have turned over on her back. . . .

Jackson also testified that, on a different occasion prior to K.J.'s death, she had asked appellant to put K.J. into her bassinet. Jackson left the room to use the restroom, then she heard K.J. start to cry. Through the crack of the door, Jackson observed appellant standing over the bassinet and making a motion with his left arm, leading Jackson to believe that either K.J. kicked appellant, or appellant hit K.J. Jackson also acknowledged, however, that appellant had been a good caregiver to K.J.

Finally, the State presented evidence in the form of testimony from K.J.'s former daycare teacher, Cynthia Hill. The trial court held a hearing outside the presence of the jury to determine whether Hill's testimony was properly admissible pursuant to Texas Code of Criminal Procedure article 38.37. Appellant objected to Hill's testimony on the ground that the State was attempting to admit evidence of an extraneous bad act, that the State was offering the evidence in order to establish the bad character of appellant, and that its evidentiary value was outweighed by its prejudicial effect. The State argued that the evidence was admissible in that it was evidence of a similar circumstance in which appellant was informed of the risk involved in shaking a baby.

5

Over appellant's objection, the trial court allowed Hill to testify about an incident between appellant and K.J. that Hill witnessed in October 2012, when K.J. was approximately three months old. As appellant dropped K.J. off at daycare, Hill came to greet them. Hill testified that K.J. was awake and alert. Hill turned to get K.J. signed in for the day in the school's "daily book." When she looked back, Hill witnessed appellant saying "Wake up, wake up, wake up" to K.J. while shaking the baby so violently that K.J.'s arms were flailing. He then appeared to be trying to put K.J. on the floor, and Hill took K.J. from appellant. Hill became concerned with the way appellant was holding his hands and asked if he required medical assistance. Appellant declined and responded that his hands were "cramping up." Hill also stated that appellant appeared alert, that he was still able to speak, and that he was able to walk around. Hill testified that she was shocked by the incident because she had never "see[n] someone just shake a baby like that in person." She told appellant that he could not shake a baby in that manner, and she reported the incident to the director of day care.

Jackson was aware of this incident. She testified that she was "shocked" when she learned of what happened at the daycare. She testified that appellant did not tell her about the incident, but she was able to discuss it with him later. Appellant told her "that he almost had a seizure, that he was having a seizure and he almost dropped [K.J.]." She stated that, at that point, she did not have any

6

reason to doubt him because she was not at the daycare when it happened. However, she also testified that from that point forward, she and appellant "started to grow apart" and their relationship became "strained."

Regarding the investigation of K.J.'s death, the State presented the testimony of Baytown Police Department Officer H. Shedd, who was the first officer on the scene on January 9, 2013. Officer Shedd testified that when she approached the apartment, she saw appellant outside talking on his phone and crying. Although Shedd interviewed appellant, he made no mention of any interaction he had had with K.J. that morning.

Detective G. Gonzalez was assigned to investigate K.J.'s death. During his initial interview with appellant at the apartment, appellant told Gonzalez that K.J. had been sick, that Jackson had taken K.J. to the pediatrician and the emergency room the day before, that he had also been sick, and that he was worried he may have gotten the baby sick. Gonzalez further testified that appellant told him he woke up around 7:30 a.m., went to the restroom, and checked on K.J. but did not see anything suspicious. Appellant told Gonzalez that he had not handled K.J. that morning and could not tell Gonzalez what time K.J. was put down in her bassinet. Gonzalez asked appellant questions such as, "[D]id she fall, was she disciplined, has she been . . . hit; and [appellant] says no, that she was too young to be hit and that she hadn't fallen."

7

Detective Gonzalez made several attempts to interview appellant at the police department, but appellant continuously put him off, making excuses and rescheduling appointments. Gonzalez was eventually able to interview appellant at the police station on February 8, 2013, and appellant admitted for the first time that he had been the one to put K.J. down to sleep on January 9, 2013, contradicting his earlier statement to Gonzalez. Appellant cut that meeting short, complaining of leg pain.

Gonzalez was unable to persuade appellant to come in to the police department again. After receiving the preliminary report from the Medical Examiner's office, declaring K.J.'s death a homicide, Gonzalez contacted appellant on April 11, 2014. Detective Gonzalez conducted a phone interview with appellant, which he recorded. During the course of this interview, Gonzalez asked appellant about K.J.'s death, and appellant again "change[d] his account of the early morning hours of January the 9th," telling Gonzalez that he held K.J. and shook her to get her to settle down to sleep. Appellant also expressed that he worried that something he had done had hurt the baby, that he was concerned about what had happened to K.J., and that he viewed K.J. as his own child. Detective Gonzalez followed up with more questions about what appellant meant when he said he "shook" her. Appellant told Detective Gonzalez that he gently shook or rocked K.J. while she ate, then he laid her down, and she moved, so "it wasn't like

she was dead already, to me." Following this conversation, Gonzalez contacted the district attorney's office, and appellant was charged in relation to K.J.'s death.

Assistant medical examiner Dr. Morna Gonsoulin conducted the autopsy on K.J. She found a bruise at K.J.'s left temple and on her right arm. She also found some abrasions. This was concerning to Gonsoulin because K.J. did not have the mobility necessary to inflict these injuries upon herself at the age of five months. Gonsoulin found a large volume of blood inside K.J.'s skull and spinal column. Gonsoulin also found both a subdural and subarachnoid hemorrhage in K.J.'s skull, a subdural hemorrhage to K.J.'s optic nerve, and a subcutaneous hemorrhage in K.J.'s back. Gonsoulin concluded that K.J.'s cause of death was the hemorrhages in her skull caused by blunt force trauma, that these injuries occurred within 24 to 48 hours before K.J.'s death, and that the effects of the injuries would have been noticeable almost immediately. Gonsoulin testified that after sustaining injuries such as those suffered by K.J., if the child "didn't seem at least a little sleepy or dazed, [she] would just pass out or become limp immediately." Gonsoulin testified that a child who had the type of acute injury that killed K.J. would not be very responsive, nor would she eat or play.

Dr. Gonsoulin also testified that blunt force trauma, as demonstrated in K.J.'s case, meant that "the child has been subjected to some force, either through an impact or through some, what we call rotational force, that was enough to cause

9

bleeding or damage to the vessels." She testified that the type of force necessary to create such an injury was "outside the range of what is normal . . . in handling a child. . . . It's not like even, say, you know, you drop a baby onto a couch or maybe the baby bumps its head against a wall. It's something that's extraordinary." Gonsoulin further testified that it was not necessary that there be an outward sign of injury such as a gash or visible bruise in order for a child to have sustained a blunt force trauma to the head, such as the one K.J. had. She testified that there were various mechanisms for creating the type of blunt force trauma K.J. exhibited—in which there were traumatic internal injuries, but minimal external signs—such as shaking, grabbing, squeezing, or hitting the baby's head against some object that was solid but padded in some way.

Appellant questioned Dr. Gonsoulin regarding the scientific basis for her statement that K.J.'s injuries were caused by blunt force trauma, potentially consistent with being shaken. Dr. Gonsoulin testified that scientific observations and case studies supported her conclusion, but she also acknowledged that some pathologists believe that shaking alone could not cause the type of injuries that K.J. sustained. However, she testified that it was generally accepted within the scientific community that someone could shake a baby to death. Regarding K.J.'s death specifically, she testified:

> I can't necessarily say [that the cause of death is] exclusively shaking, because there's evidence of impact that [is] not part of the routine in a

10

five-month-old. The child's head has obviously been subjected to some blunt force on two sides of the head in addition to whatever mechanism, shaking or hitting up against something. So whatever the cause is, it's not exclusively shaking. There is some impact. So either way, it's still a blunt force.

Dr. Glenn Sandberg, a forensic neuropathologist, testified that he observed subdural hematomas in K.J.'s brain that "occurred at or around the time of death." Sandberg also observed subarachnoid hemorrhages in K.J.'s brain, bleeding around her spinal cord, and hemorrhages in her eyes, including around the retinas and optic nerve. He testified that these injuries were indicative of "significant traumatic injury." Sandberg also testified that K.J. had some resolving injuries that could have been consistent with an injury two or three months prior to her death. However, he identified the acute injuries as occurring at or near her time of death. Sandberg stated that he would expect a person with the acute injuries he observed in K.J. to be "immediately symptomatic in some way," such as becoming dazed or unconscious, or experiencing seizures, vomiting, or nausea. He further testified that, based on her age and the extent of her injuries, he would have expected K.J. to experience "an immediate loss of consciousness."

Sandberg testified that the type of injuries sustained by K.J. were consistent with "rotational acceleration/deceleration injuries." He stated that such injuries could be caused by shaking, by "tak[ing] a punch to the side of the face, the chin, that would spin your head around," or by some other impact or mechanism that

11

would cause the "head [to] whip[] around all over the place." Sandberg acknowledged that there "is controversy" about whether an infant can experience this type of injury due to shaking alone, but he believed that it was possible and consistent with the injuries he had observed.

Dr. Sandberg stated that K.J.'s injuries could not have been the result of "[a] simple accidental injury like household injury":

> Just, you know, dropping an infant on the floor, an infant falling off a couch, off a changing table, you know, just the usual things that, if any of you have kids, that happen to them around the house usually do not result in these sorts of catastrophic injuries.

Sandberg testified that the types of injuries he observed in K.J. could be consistent with several causes:

> [P]robably the most common scenario is an impact. So a caregiver impacting a child's head against a firm object or a hard object, and that generates quite a bit of force. I can also imagine a scenario where there could be previous shaking and shaking combined with an impact, and that's also an accepted way of finding these changes.

Dr. Deborrah Pinto, a forensic anthropologist, found fractures on K.J.'s ribs that were consistent with forcefully grabbing a baby around her chest and that were inconsistent with the normal handling of a baby, although she also stated that they could have been inflicted by performing CPR.

These experts, having examined K.J., concluded that K.J. suffered some sort of blunt trauma to the head, such as that caused by shaking accompanied with a blow to the head by an unidentified object. This severe head trauma caused K.J. to

12

vomit and aspirate the vomited baby formula, leading to respiratory distress, and, ultimately, cardiac arrest.

Appellant presented testimony of family members that he suffered from epileptic seizures. His godmother, Kim Cook, testified that she believed appellant suffered from epilepsy and that she had witnessed him having seizures on two occasions. On one occasion, while she was home visiting her mother Cynthia Jackson, who had been appellant's guardian for most of his life, appellant was in his room when he "stopped talking mid sentence," and she "noticed that there was sort of a glaze over his eyes." She asked if he was okay, but he could not respond. His hands and body began to shake and his "body had become very tense." Once he relaxed, she asked again if he was okay, and "he just shook his head." Cook also recounted a second occasion when she observed appellant have a seizure in the garage at her mother's house. Cook believed that appellant had obtained medical treatment for his seizures.

Cynthia Jackson, appellant's aunt who raised him from a young age, also testified that appellant, who was 31 at the time of trial, had been suffering from seizures since he was approximately 25 or 26 years old, and she had observed several of them. She stated that the seizures were "very intense" and that appellant "would be very, very tired afterwards and would have to rest up and kind of gather

his thoughts." She did not recall having any conversations with appellant regarding his having had a seizure at or around the time that K.J. died.

Appellant also introduced into evidence his medical records from treatment he received in February 2012. The records demonstrate that he was admitted to the hospital experiencing "sudden clenching of his hand," during which episode he did not lose consciousness. He was evaluated for "seizure activity," although the testing conducted was "negative for epileptiform activity" and revealed "[n]o findings to explain the patient's seizures."

The jury charge instructed the jury that "[o]ur law provides that a person commits an offense if he recklessly, by act, causes to a child, serious bodily injury." The charge further instructed the jury on the elements of reckless injury to a child.

> The charge allowed the jury to convict appellant if it found:
>
> from the evidence beyond a reasonable doubt that on or about the 9th day of January, 2013, in Harris County, Texas, [appellant] did then and there unlawfully, recklessly cause serious bodily injury to [K.J.], a child younger than fifteen years of age, by shaking [K.J.] with a deadly weapon, namely his hand; or
>
> If [it found] from the evidence beyond a reasonable doubt that on or about the 9th day of January, 2013, in Harris County, Texas, [appellant] did then and there unlawfully, recklessly cause serious bodily injury to [K.J.], a child younger than fifteen years of age, by striking [K.J.] against a deadly weapon, namely a blunt object, then you will find the defendant guilty of recklessly causing serious bodily injury to a child younger than fifteen years of age, as charged in the indictment.

14

The charge further admonished the jury, "Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict 'Not Guilty.'"

Appellant objected to the jury charge, requesting an instruction on the lesser-included offense of criminally negligent injury to a child. He based his objection on an argument that he had a history of seizures and that a seizure could have been the cause of the injury to K.J. The trial court overruled appellant's objection to the jury charge.

The jury convicted appellant of recklessly causing serious bodily injury to K.J., as charged in the indictment. During the punishment phase, appellant pled true to having been previously convicted of the felony offense of burglary of a habitation in 2005 and 2008. The jury subsequently assessed appellant's punishment at seventy-five years' confinement. This appeal followed.

## Sufficiency of the Evidence

In his first issue, appellant argues that the evidence was insufficient to support his conviction.

### A. Standard of Review

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable

15

doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). A jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted).

We may not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We afford almost complete deference to the jury's credibility determinations. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination."). Circumstantial evidence is as probative as direct evidence in establishing guilt, and

circumstantial evidence alone can be sufficient to establish guilt. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011) (quoting *Clayton*, 235 S.W.3d at 778). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

## B.    Injury to a Child

A person commits the offense of injury to a child if he "intentionally, knowingly, recklessly, or with criminal negligence, by act . . . causes to a child . . . serious bodily injury." TEX. PENAL CODE ANN. § 22.04(a)(1) (West Supp. 2016); *Jefferson v. State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006). The offense is a second degree felony when the conduct is engaged in recklessly. TEX. PENAL CODE ANN. § 22.04(e). The offense is a "state jail felony when the person acts with criminal negligence." *Id.* § 22.04(g).

A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id.* § 6.03(c) (West 2011). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard

17

of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.*

"Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct." *Williams*, 235 S.W.3d at 750. Thus, "[t]he State must prove that a defendant caused a child's serious bodily injury with the requisite criminal intent." *Id.*; *see also Jefferson*, 189 S.W.3d at 312 ("This Court's prior case-law also supports a decision that the essential element or focus of the statute is the result of the defendant's conduct (in this case, serious bodily injury to a child) and not the possible combinations of conduct that cause the result."); *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985) (holding that because injury-to-child statute does not specify "nature of conduct," conduct is inconsequential to its commission as long as conduct is voluntary and done "with the required culpability to effect the *result* the Legislature has specified") (emphasis in original); *Beggs v. State*, 597 S.W.2d 375, 377 (Tex. Crim. App. 1980) (stating that injury-to-child statute focuses on result of defendant's conduct).

Direct evidence of the required mental state is not required. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Instead, the required culpable mental state may be inferred from the surrounding circumstances. *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984).

18

## C. Analysis

Here, the State presented evidence that K.J. was acting normally into the early morning hours of January 9, 2013, the day she died. Jackson, Dr. Taghadosi, and Dr. Panzarella all testified that, other than exhibiting symptoms of congestion and an eye infection, K.J. was a normal and healthy five-month-old. Jackson testified that she returned home from the hospital at approximately 3:30 a.m. on January 9, 2013, and put K.J. to bed. K.J. became fussy, and appellant offered to feed her and walked out of the room with her. Jackson did not see K.J. again until later in the morning of January 9, when Jackson discovered K.J. in her bassinet, not breathing.

Appellant gave inconsistent statements to the police regarding his contact with K.J. on January 9. Officer Shedd testified that when she interviewed appellant, he made no mention of any interaction he had had with K.J. that morning. Detective Gonzalez testified that appellant was evasive about completing his interview. Although appellant originally denied having any contact with K.J., during the interview with Gonzalez on February 8, 2013, appellant acknowledged for the first time that he had been the one to put K.J. down to sleep on January 9, 2013. He later told Detective Gonzalez that he gently shook or rocked K.J., but he did not believe his actions caused the baby's death.

19

However, medical experts testified regarding K.J.'s condition at the time of her death and her cause of death. Dr. Gonsoulin testified that K.J. had a bruise over her left temple and that she had some abrasions, which was unusual because K.J., at the age of five months, did not have the mobility necessary to inflict these injuries on herself. Gonsoulin found a large volume of blood inside K.J.'s skull and spinal column, and she also found both subdural and subarachnoid hemorrhages in K.J.'s skull, a subdural hemorrhage to K.J.'s optic nerve, and a subcutaneous hemorrhage in K.J.'s back. Gonsoulin concluded that K.J.'s cause of death was the hemorrhages in K.J.'s skull due to blunt force trauma. Dr. Sandberg testified that the subdural and subarachnoid findings in K.J.'s brain combined with her spinal cord injuries and hemorrhages in her eyes and optic nerve were indicative of a traumatic injury like shaking or impacting her head against a firm object. The experts also testified that K.J.'s injuries did not come from a simple injury or an accidental fall, but rather from impacting her head against a firm object or shaking combined with an impact. This caused severe head trauma, which caused K.J. to vomit. K.J. then aspirated her baby formula, which resulted in respiratory distress and cardiac arrest. The medical experts also all testified that the effects of her injuries would have been immediately noticeable and that the injuries occurred shortly before her death.

Considering all of this evidence together, we conclude that there is sufficient evidence supporting the jury's finding that appellant recklessly caused serious bodily injury to K.J. *See* TEX. PENAL CODE ANN. § 22.04(a)(1); *Jefferson*, 189 S.W.3d at 312. K.J. had been acting normally prior to appellant's leaving the room to feed her early on January 9, 2013. Just a few hours later, Jackson found K.J. not breathing. No one had touched K.J. between the time when appellant had fed her and walked around with her and when Jackson discovered that she was not breathing. Medical experts agreed that she died from injuries obtained within a few hours prior to her death, while she was in appellant's care, and that her injuries could not have been caused by a simple injury or an accidental fall. *See Bearnth v. State*, 361 S.W.3d 135, 140–41 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (holding that evidence was sufficient to support felony-murder conviction when defendant was only adult present when child sustained injuries, defendant provided "changing narrative" of how injuries occurred, and medical evidence demonstrated that defendant's explanation of cause of injuries was not possible); *Williams v. State*, 294 S.W.3d 674, 683 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (holding that evidence was sufficient in injury-to-child case when medical examiner testified that child's injuries could not have occurred as defendant described and were sustained by violent physical abuse at time when defendant was alone with child).

Appellant argues that the evidence was insufficient because there was no eyewitness or other direct evidence that he shook or otherwise harmed K.J. However, the State need not have established appellant's guilt with direct evidence—circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *See Sorrells*, 343 S.W.3d at 155. "Injury to a child cases particularly depend on circumstantial evidence because 'there is rarely direct evidence of exactly how the child's injuries occurred.'" *Bearnth*, 361 S.W.3d at 140 (quoting *Williams*, 294 S.W.3d at 683). Here, the combined and cumulative force of all the circumstances permits the conclusion that the jury was rationally justified in finding appellant guilty beyond a reasonable doubt. *See id.* Appellant was the person caring for K.J. at the time she received the fatal injuries. *See id.*; *see also Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd) ("Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies.").

Appellant also points to evidence that he argues is so overwhelming that it outweighs the evidence of his guilt. He argues that the jury received evidence that he was crying when police arrived, that K.J. showed no outward sign of trauma, that lethal aspiration can be caused by failure to burp, that appellant was a careful

caregiver, that some medical experts believe that it is impossible to shake a baby to death, and that appellant's seizures could have contributed to K.J.'s death.

We first observe that appellant's argument that contrary evidence in the record "outweighs" evidence of his guilt does not conform to the applicable standard of review used in evaluating challenges to the sufficiency of the evidence. When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 859 (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). Employing this standard, viewing all of the evidence in the light most favorable to the jury's verdict, we conclude that, even considering the evidence identified by appellant, the jury could have found the essential elements of the offense beyond a reasonable doubt. *See Adames*, 353 S.W.3d at 859.

The jury, as the sole judge of the credibility of the witnesses and the weight to be given their testimony, was free to weigh all of the evidence before it, including evidence of appellant's actions and demeanor. *See Bartlett*, 270 S.W.3d at 150; *Williams*, 294 S.W.3d at 683. Regarding the medical evidence, while Dr. Gonsoulin and Dr. Sandberg both acknowledged some controversy within the scientific community regarding whether a person can shake a baby with enough

23

force to cause injuries like the ones K.J. sustained here, they also testified that it was commonly accepted that some combination of shaking and an impact to the head was a cause of the types of injuries K.J. received.

Gonsoulin and Sandberg also agreed that, while K.J. did not show outward signs of trauma, her internal injuries were nevertheless consistent with some sort of blunt force trauma. And they testified that, although respiratory distress could be caused by numerous other causes, given the nature of K.J.'s head injuries, they believed her subsequent vomiting and respiratory distress were caused by her head trauma. They testified that, in their expert opinions, K.J.'s death was caused by blunt force trauma associated with some kind of impact or an impact combined with shaking. The jury was entitled to credit this testimony. *See Shah v. State*, 403 S.W.3d 29, 34 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) ("Reconciliation of conflicts and contradictions in the evidence was within the province of the [factfinder], and such conflicts will not call for reversal if there was enough credible testimony to support the conviction.").

We overrule appellant's first issue.

**Admission of Evidence of Extraneous Offense**

In his second issue, appellant argues that the trial court erred in allowing evidence of an extraneous offense by permitting Cynthia Hill to testify that she had previously seen appellant shaking K.J. and that she had told him he could not

shake a baby in that manner. Appellant contends that Hill's testimony should not have been admitted because it was irrelevant, it attempted to show his bad character, and its prejudicial effect outweighed its probative value.

## A.      Standard of Review

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). A trial court's ruling will not be reversed unless it falls outside the zone of reasonable disagreement. *Id.*

An extraneous offense is "any act of misconduct, whether resulting in prosecution or not, that is not shown in the charging papers." *Rankin v. State*, 953 S.W.2d 740, 741 (Tex. Crim. App. 1995) (emphasis omitted). In general, extraneous offense evidence is inadmissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *See* TEX. R. EVID. 404(b)(1); *Batiste v. State*, 217 S.W.3d 74, 84 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

However, for crimes against children, such as reckless injury to a child, the Texas Code of Criminal Procedure provides:

> Notwithstanding Rules 404 and 405, Texas Rules of Evidence, evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense shall be admitted for its bearing on relevant matters, including:
>
> (1) the state of mind of the defendant and the child; and

25

(2) the previous and subsequent relationship between the defendant and the child.

TEX. CODE CRIM. PROC. ANN art. 38.37, § 1(b) (West Supp. 2016). Code of Criminal Procedure article 38.37 also provides that it "does not limit the admissibility of evidence of extraneous crimes, wrongs, or acts under any other applicable law." *See id.* art. 38.37, § 4.

Thus, article 38.37 is itself an exception to Rule 404(b) for certain cases and eliminates the necessity of showing that the evidence falls within an enumerated exception under Rule 404(b). *See Hitt v. State*, 53 S.W.3d 697, 705 (Tex. App.—Austin 2001, pet. ref'd) (holding that article 38.37 supersedes Rule 404); *McCulloch v. State*, 39 S.W.3d 678, 684 (Tex. App.—Beaumont 2001, pet. ref'd) (holding that article 38.37 eliminates necessity of proving evidence falls within Rule 404(b)'s exceptions). However, even when extraneous acts are relevant under article 38.37, the evidence may be excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needless presentation of cumulative evidence. *Belcher v. State*, 474 S.W.3d 840, 847 (Tex. App.—Tyler 2015, no pet.); *Hitt*, 53 S.W.3d at 706.

The relevant factors in determining whether the prejudice of an extraneous offense substantially outweighs its probative value include: (1) how compellingly

the extraneous-offense evidence serves to make a fact of consequence more or less probable—a factor that is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense; (2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way"; (3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and (4) the force of the proponent's need for this evidence to prove a fact of consequence, i.e., whether the proponent has other probative evidence available to him to help establish this fact, and whether this fact is related to an issue in dispute. *Burke v. State*, 371 S.W.3d 252, 257 (Tex. App.—Houston [1st Dist.] 2011, pet. dism'd) (citing *Mozon v. State*, 991 S.W.2d 841, 846–47 (Tex. Crim. App. 1999)).

In determining whether potentially prejudicial evidence was properly admitted, the appropriate inquiry is not whether the evidence was more prejudicial than probative, but rather, whether the probative value was substantially outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence. *See Resendiz v. State*, 112 S.W.3d 541, 545 (Tex. Crim. App. 2003). In the balancing analysis, however, a presumption favors probative value over unfair prejudice or cumulative effect. *See Goldberg v. State*, 95 S.W.3d 345, 375 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). Whether evidence is

admissible under Rule 403 is within the sound discretion of the trial court. *See Powell v. State*, 189 S.W.3d 285, 288 (Tex. Crim. App. 2006).

## B. Analysis

Here, the trial court conducted a hearing outside the presence of the jury to determine whether Hill's testimony would be adequate to support a finding by the jury that appellant committed the extraneous act beyond a reasonable doubt. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2-a (West Supp. 2016). The State made a proffer of Hill's anticipated testimony, and appellant objected on the grounds that the State was attempting to admit evidence of an extraneous bad act, that the State was offering the evidence in order to establish appellant's bad character, and that its evidentiary value was outweighed by its prejudicial effect. The State argued that the evidence was admissible pursuant to article 38.37 and that it was necessary to prove that appellant acted recklessly, in that he had been involved in a previous incident of shaking K.J. and knew the harm that could result from handling a baby in that manner.

The trial court overruled appellant's objections and permitted Hill to testify. Hill testified that she witnessed appellant saying "Wake up, wake up, wake up" to K.J. while shaking the baby so violently that K.J.'s arms were flailing. Hill testified that she was shocked by the incident because she had never "see[n] someone just shake a baby like that in person." She told appellant that he could not

28

shake a baby in that manner, and she reported the incident to the director of K.J.'s day care.

We agree with the State that the evidence of this incident falls under article 38.37, which provides that for crimes against children, such as reckless injury to a child, "evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense" is admissible "for its bearing on relevant matters" such as the defendant's state of mind and the previous relationship between the defendant and the child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37, § 1. Thus, to the extent appellant is complaining on appeal that Hill's testimony constituted extraneous offense evidence that violated Rule 404(b) in that it sought "to prove [his] character in order to show action that on [this] particular occasion [he] acted in accordance with the character," we overrule his complaint. In creating an exception to Rule 404(b) for certain cases, article 38.37 eliminates the necessity of establishing that the evidence falls within an exception enumerated under Rule 404(b) in order for it to be admissible. *See Hitt*, 53 S.W.3d at 705; *McCulloch*, 39 S.W.3d at 684.

Appellant also complained that the evidentiary value of Hill's testimony was outweighed by its prejudicial effect. Evidence admissible under article 38.37 is still subject to analysis under Rule 403. *See Belcher*, 474 S.W.3d at 847; *Hitt*, 53 S.W.3d at 706. In determining whether the trial court erred in admitting Hill's

testimony under Rule 403, we first consider the probative value of Hill's testimony. *See Burke*, 371 S.W.3d at 257. Here, the extraneous act evidence was probative of the relationship between appellant and K.J., in that it showed a previous incident in which appellant's conduct subjected K.J. to a risk of harm. *See Hinojosa v. State*, 995 S.W.2d 955, 957–58 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (evidence of extraneous acts committed by appellant against complainant, including other incidents of abuse, showed their previous and subsequent relationship as well as their states of mind).

Nor did this evidence have strong potential to impress the jury "in some irrational but nevertheless indelible way." *See Burke*, 371 S.W.3d at 257. Although startling, the incident described in Hill's testimony did not cause serious bodily injury to K.J. and, thus, is no more heinous than the alleged conduct that caused K.J.'s death. *See*, *e.g.*, *Jones v. State*, 119 S.W.3d 412, 422–23 (Tex. App.—Fort Worth 2003, no pet.) (holding that evidence of extraneous offense that was less heinous than charged acts was not likely to create such prejudice in minds of jurors); *see also Taylor v. State*, 920 S.W.2d 319, 323 (Tex. Crim. App. 1996) (holding extraneous evidence of prior murder was no more heinous than charged offense and was not likely to create such prejudice that jurors would have been unable to limit their consideration of extraneous evidence to its proper purpose). And Hill's testimony that she saw appellant shake K.J. was not likely to create an

irrational or overly emotional response in the minds of the jurors such that they would have been unable to limit their consideration of the evidence to its proper purpose. *See Salazar v. State*, 90 S.W.3d 330, 336 (Tex. Crim. App. 2002) (assessing prejudicial effect of victim impact evidence and standard for assessing "the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way," including through overly emotional evidence).

The State did not spend an excessive amount of time in developing Hill's testimony. Hill's testimony regarding the incident constituted only seven pages of a lengthy record in which the State spent the majority of its effort in establishing the elements of the charged offense. *See Burke*, 371 S.W.3d at 257. And, as the State argued, this evidence was relevant in establishing that appellant acted recklessly in relation to K.J. at the time of her death, in that he knew handling the baby in a rough manner was dangerous. Thus, the evidence was necessary to show an essential and disputed element of the charged offense. *See Prescott v. State*, 123 S.W.3d 506, 515 (Tex. App.—San Antonio 2003, no pet.) (holding evidence was admissible for limited purpose of proving culpable mental state in case involving reckless injury to child). The evidence was also necessary to rebut the defensive theory that appellant was a good caregiver and did not cause K.J.'s death.

Accordingly, we conclude that appellant has failed to show that any prejudice created by the admission of Hill's testimony regarding appellant's

31

shaking of K.J. at the daycare substantially outweighed its probative value. We hold that the trial court did not err in overruling appellant's Rule 403 objection.

We overrule appellant's second issue.

## Charge Error

In his third issue, appellant argues that the trial court erred by denying his request to charge the jury on the lesser-included offense of criminally negligent injury to a child.

### A.     Standard of Review

We use a two-step process in reviewing jury charge error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Steele v. State*, 490 S.W.3d 117, 126 (Tex. App.—Houston [1st Dist.] 2016, no pet.). First, we determine whether error exists in the charge. *Ngo*, 175 S.W.3d at 743; *Steele*, 490 S.W.3d at 126. If error does exist, we review the record to determine whether the error caused sufficient harm to require reversal of the conviction. *Ngo*, 175 S.W.3d at 743; *Steele*, 490 S.W.3d at 126. When the defendant properly objected to the error in the charge, reversal is required unless the error was harmless. *Ngo*, 175 S.W.3d at 743–44; *Steele*, 490 S.W.3d at 126; *see also Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (providing that, to preserve error in jury charge, defendant must object or request specific charge).

Here, appellant was charged with recklessly causing serious bodily injury to K.J., but he contends that he was entitled to a jury instruction on the lesser-included offense of negligently causing serious bodily injury to a child. We review the trial court's decision regarding the failure to submit a lesser-included offense instruction for an abuse of discretion. *Steele*, 490 S.W.3d at 126; *Brock v. State*, 295 S.W.3d 45, 49 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

Code of Criminal Procedure article 37.09 provides that an offense constitutes a lesser-included offense of a charged offense if:

> (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
>
> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
>
> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
>
> (4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006); *Steele*, 490 S.W.3d at 127. We use the statutory elements and the facts alleged in the charging instrument to find lesser-included offenses. *See Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007); *Steele*, 490 S.W.3d at 127.

We employ a two-step analysis in determining whether the trial court should have given an instruction on a lesser-included offense. *Hall*, 225 S.W.3d at 535–

36; *Steele*, 490 S.W.3d at 127. First, we must determine whether an offense is a lesser-included offense of the charged offense, and this is a question of law that does not depend on the evidence to be produced at trial. *Hall*, 225 S.W.3d at 535; *Steele*, 490 S.W.3d at 127. This step must be capable of being performed before trial "by comparing the elements of the offense as they are alleged in the indictment or information with the elements of the potential lesser-included offense." *Hall*, 225 S.W.3d at 535–36. The second step of the analysis asks whether there is evidence that supports giving the lesser-included offense instruction to the jury. *Id.* at 536.

The Court of Criminal Appeals has held that:

[a] defendant is entitled to an instruction on a lesser-included offense where the proof for the offense charged includes the proof necessary to establish the lesser-included offense and there is some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser-included offense.

*Id.* (quoting *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)). There must be affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense. *See Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012). In this portion of the analysis, anything more than a scintilla of evidence entitles the defendant to the instruction. *Hall*, 225 S.W.3d at 536. The evidence must establish the lesser-included offense as "a valid, rational alternative to the charged offense." *Id.*; *Williams*, 294 S.W.3d at 681

34

(stating that "[t]here must be affirmative evidence in the record raising the lesser offense before an instruction is warranted").

The test for determining whether evidence is legally sufficient and the test for determining whether to submit a lesser-included offense instruction are "quite different." *Wasylina v. State*, 275 S.W.3d 908, 909 (Tex. Crim. App. 2009) (quoting *Hampton v. State*, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005)); *Steele*, 490 S.W.3d at 128. "The evidence could easily be legally sufficient to support a conviction for a lesser-included offense but not justify the submission of a lesser-included-offense instruction because the evidence does not show that the defendant is guilty *only* of the lesser-included offense." *See Wasylina*, 275 S.W.3d at 909–10 (emphasis in original).

## B.    Analysis

Appellant's indictment alleged that he recklessly caused serious bodily injury to K.J. by shaking her with his hands or by striking her against a blunt object. The trial court's charge likewise instructed the jury that it could find appellant guilty if it found that he recklessly caused serious bodily injury to K.J. either by shaking her or by striking her against a blunt object. Appellant objected to the jury charge, arguing that he was entitled to a jury instruction on the lesser-included offense of negligent injury to a child. In the first step of our analysis, we must determine whether the trial court's refusal to include this instruction in the

35

jury charge constituted error. *See Ngo*, 175 S.W.3d at 743; *Steele*, 490 S.W.3d at 126.

The State concedes that negligent serious bodily injury to a child is a lesser-included offense of the charged offense here, reckless serious bodily injury to a child. *See Hall*, 225 S.W.3d at 535; *Steele*, 490 S.W.3d at 127. A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. TEX. PENAL CODE ANN. § 6.03(c). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.* On the other hand, a person acts with criminal negligence when he takes some action and ought to be aware of a substantial and unjustifiable risk that the result (in this case, injury to a child) will occur. *See id.* § 6.03(d).

Negligent serious bodily injury to a child is distinguishable from reckless serious bodily injury to a child only in the culpable mental state that the State is required to prove, and criminally negligent conduct requires a lesser culpable mental state than reckless conduct. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09(1), (3); *see also Wortham v. State*, 412 S.W.3d 552, 555 (Tex. Crim. App. 2013)

(holding that reckless and criminally negligent injury to child are lesser-included offenses of intentional and knowing injury to child).

However, the State argues that there is no affirmative evidence to support an instruction on the lesser-included offense of criminally negligent serious bodily injury to a child, and we agree. Appellant argues that "the evidence shows that Laquisha Jackson testified that [a]ppellant described to her how his seizure caused him to almost drop the baby at the daycare." He also points to Cook's and Cynthia Jackson's testimony of his history of seizures and his medical records. However, none of this evidence indicates that he had a seizure on the morning that K.J. was injured and died. The fact that appellant had a history of seizures does not constitute evidence that he had a seizure while he was caring for K.J. on January 9, 2013, or that his having a seizure while caring for K.J. could have caused the type of injuries that K.J. received. There were no witnesses or medical evidence indicating that appellant had a seizure on January 9, 2013. *See Hall*, 225 S.W.3d at 536; *see also Wortham*, 412 S.W.3d at 558 (holding that evidence that defendant is guilty only of lesser-included offense "cannot be mere speculation—it must consist of affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense").

Furthermore, there is no evidence that rebuts the culpability element of the greater offense, recklessly causing serious bodily injury to a child. *See Wortham*,

412 S.W.3d at 558. There was no evidence that appellant was merely criminally negligent in caring for K.J. in spite of his history of seizures, rather than reckless in causing the fatal blunt force trauma. Laquisha Jackson testified that, after K.J. was taken away by the paramedics, she asked appellant what had happened, and he specifically denied having a seizure. And Dr. Gonsoulin and Dr. Sandberg both testified that the injuries K.J. sustained could not have been caused by a simple injury or an accidental fall, but rather were caused by a substantial and forceful impact to her head or by a combination of an impact and shaking.

Thus, the jury could not have rationally found that appellant was guilty only of criminally negligent injury to a child and not the greater offense of reckless injury to a child. *See Hall*, 225 S.W.3d at 536. Accordingly, the trial court did not abuse its discretion in refusing to submit an instruction on criminally negligent injury to a child to the jury. *See Steele*, 490 S.W.3d at 126; *Brock*, 295 S.W.3d at 49.

We overrule appellant's third issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Lloyd.

Do not publish. TEX. R. APP. P. 47.2(b).