

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00222-CR

_____

TYRUS KEVON JOHNSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 217th District Court
Angelina County, Texas
Trial Court No. 2017-0317

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

MEMORANDUM OPINION

An Angelina County[1] jury found Tyrus Kevon Johnson guilty of two counts of aggravated sexual assault of a child.[2]  After a punishment hearing, the trial court sentenced Johnson to forty years' imprisonment on each count, with the sentences to run concurrently.

In this appeal, Johnson complains that the trial court abused its discretion (1) when it admitted the State's search warrant and supporting affidavit and (2) when it admitted voluminous records from Johnson's cell phone containing over 500 pornographic images and over 400 search results containing links to pornographic websites.  Because we find that the trial court abused its discretion in admitting the voluminous pornographic images and website links that harmed Johnson's substantial rights, we reverse the trial court's judgment and remand this case for a new trial.

I.    **Background**

At trial, the State elicited outcry witness testimony from Britni, who was the wife of the victim's father, Steven.  Britni testified that the victim, Jane,[3] came to live with them in September 2016, because she did not want to be at her mother's home with Johnson.  At the time, Jane was eight years old.  Within two months, Jane's brothers, Carl and Connor, also came to live with Britni and Steven.  At the time, the children's mother, Rebecca, was living with

---

[1]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.  *See* TEX. GOV'T CODE ANN. § 73.001.  We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue.  *See* TEX. R. APP. P. 41.3.

[2]*See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (ii), (2)(B).

[3]We use pseudonyms when referring to all persons who were minors when the alleged offenses were committed.  *See* TEX. R. APP. P. 9.10(a)(3).

Johnson. In late January 2017, Jane told Britni that one time Johnson wanted to play a game called "suck the thumb," and he showed her some photographs on his cell phone of people "humping." Jane also told Britni that Johnson had offered her popsicles and had her close her eyes, then she felt something squishy in her mouth. Jane called it his "thingy," which Britni understood to mean his penis.

After this disclosure, Britni called Child Protective Services (CPS) and the Angelina County Sheriff's Department (ASD), who directed them to Harold's House (Harold's), the Children's Advocacy Center (CAC) in Lufkin. She took the three children to Harold's to be interviewed. About one month later, Britni had another conversation with Jane in which Jane told her that another time[4] she was taking a bath when Johnson came in, put her on the sink counter, and tried to put his penis in her private. Jane told Britni that it hurt. Britni called the detective investigating the case and took Jane to Harold's a second time. At Harold's, Jane received a sexual assault examination from a sexual assault nurse examiner (SANE) and counseling.

Elizabeth Hancock, a sergeant over the detective division at ASD, took over the investigation of the case after the original investigator went to another agency. Hancock testified that, when she reviewed Jane's CAC interviews, Jane had said something about pornographic photographs or recordings shown to her on Johnson's cell phone and that she obtained a search warrant for the cell phone.

---

[4]The State alleged that the two aggravated sexual assaults occurred on or about February 1 and 4, 2015.

Johnson objected to any testimony or other evidence about pornographic images on his cellphone and argued that "the probative value of that [was] essentially outweighed" and that it would simply "inflame the jury." The trial court overruled his objection but granted Johnson a running objection to the contents of the cell phone and any testimony regarding the same. The trial court also admitted the search warrant and the supporting affidavit over Johnson's hearsay objection. The supporting affidavit contained many references to "child pornography" and "child erotica."

Hancock testified that, after the data was extracted from the cell phone, she examined the report for images that would confirm Jane's statements that she was shown videos of a boy and girl humping. She testified that she had found a lot of pornographic videos and photographs that depicted people having sexual intercourse.

Hancock acknowledged that the alleged offense took place in 2015, that the cell phone was one that Johnson had in 2017, and that the cell phone was not processed until much later. She also admitted that she did not know if it was the same cell phone Johnson had in 2015 or whether the same information on the cell phone in 2015 was currently on the cell phone. Nevertheless, Hancock testified that, based on her training and experience, people who look at pornography often keep the images and videos, even if they transfer devices.

The State also elicited testimony from Nathan Frazier, who is a detective in the criminal investigation division of the ASD. Frazier gave extensive testimony regarding the process he used to extract data from Johnson's cell phone and the report generated from that extraction, which was performed in 2019. Through Frazier, the State introduced a DVD of the extraction

4

report as State's Exhibit 4, which contained all of the data extracted from the cell phone, including over 500 pornographic images, and the web search history that contained over 400 search results for pornographic websites. The State also introduced State's Exhibit 7, which contained the web history report from the extraction report. At the State's request, Frazier read certain entries from State's Exhibit 7, all of which were viewed on March 20 or 22, 2017: "Cute, miniature, legal age teenager sex," "Cute, brunette teen casting couch sex for cash with a complete stranger," "F-ing hot teen," and "Horny midget slut picks up guy." The State also introduced State's Exhibit 8, which contained nine pages containing sixty-five pornographic "thumbnail" images and nine pages of selected images that had been enlarged full size, which was published to the jury.[5] Frazier informed the jury that clicking on a thumbnail image from the extraction report would produce a full-sized image. Frazier also acknowledged that some of the images appeared to be "very young looking adult children," but not underage children.

Kim Riddle, the SANE coordinator at Harold's, testified that she performed a sexual assault examination on Jane in March of 2017. She testified that Jane gave her the following patient history:

> I am here because of my stepdad, [Johnson]. [Johnson], when I was at mama's house and she was at work, I went in the bathroom to take a bath, and he came in there and he picked me up and he put me on the counter. He told me to open my legs, and I did, and he put his middle part in my girl part. He was trying to get it in and it hurt. This happened more than one time. He did the same thing. When this happened to me, then it was two days and he did it again. It hurted [sic] when I peed.

---

[5]No limiting instructions were requested or given when State Exhibits 4, 6, and 7 were admitted into evidence.

Riddle testified that she did not find any acute injuries, but that Jane did have a small white scar on the posterior fourchette, which indicated that there was some type of injury that had healed. She also testified that the patient history provided by Jane accorded with the injury to the fourchette. That said, on cross-examination, Riddle testified that what she called a scar could also be a normal finding since white lines do appear sometimes and that it could have been caused by something else.

Kim Basinger, a SANE and forensic nurse who testified for Johnson, testified that some of the findings in Riddle's report have other possible explanations. Although she agreed that a scar would fit with the patient history, she testified that it was hard to confirm the white area was a scar based on the photographs. If it was not a scar, it would be a normal finding, and if it was a scar, it could have been caused by any kind of trauma. She also testified, however, that the person who examined Jane would be in a better position to render an opinion on what the white area was.

Jane's brother, Carl, testified that when they lived across from Slack Elementary, he was watching SpongeBob, he heard something, and he went to investigate. He looked through the crack of the door of Jane's room and he saw half of Johnson's body. He heard Johnson ask Jane if she wanted to play "suck the worm," and that is when it happened. He heard Jane say "ewww" and saw Johnson standing in front of Jane with his pants down. Jane was sitting on the bed, and Johnson's hands were on her head. He had seen nothing like that before or since. He testified that he did not talk with anyone about it because he did not think it was a big deal, but he told Britni about it after Jane did. Carl testified that he had seen photographs of naked women

6

in some magazines in a drawer at the house but had never seen them on a phone or a computer. Carl did not remember when the incident happened or how old he was at the time, but described the trailer house that he lived in with his mother, Jane, and Connor. He also testified that he never told his mother about it, that he never talked with Jane or Connor about it, and that he did not tell his father. He also never told his Papaw or Mamaw about the incident. He explained that he had not seen Johnson's private parts, that Jane did not look like she was being hurt, and that he did not think a crime was being committed.

Connor also testified about the same incident. He similarly testified that he looked through the cracked open door and heard Johnson tell Jane to "suck the worm." He saw Jane sitting on the bed, Johnson facing her, and Johnson putting his private parts into Jane's mouth. He testified that he was only nine or ten years old at the time and that he did not know what to do. Connor testified that he told no one because it would embarrass Jane and only told Britni after Jane had. He also testified that, about a month after the first incident, he saw Johnson go in the bathroom when Jane was taking a bath. Connor again looked through the cracked door and heard Johnson tell Jane to get out. When Jane refused, he saw Johnson get in the bath with her naked. He also testified that, on one occasion, he was playing a game on Johnson's cell phone and saw a photo of a naked boy and girl having sex.

Jane testified that she was in the living room playing Xbox when Johnson told her to "come there," and they went to her room. He asked her if she wanted to play "suck the worm," but she did not know what he was talking about. So he sat her on the bed and told her to close her eyes, then he put his "stuff," that is, his "dick," in her mouth and told her to suck on it and

7

move her head back and forth. Johnson did this a couple of times, then she told him she did not want to play anymore. He stopped but said he would give her five popsicles if she would do it again. She did, and he again told her to move her head back and forth and suck. She kept her eyes closed and did it, but then she said, "No." Johnson then showed her photographs of naked adults that she thought were humping. Jane said that he showed her photographs, but no videos. When he showed them to her, she said "ewww" because it was nasty. Johnson gave her the popsicles and told her not to tell anyone. She did not know her brothers had seen this until she told Britni, and she was embarrassed when she found out that they had.

Jane also testified that another time she was taking a bath and Johnson came in and told her to get up. When she did, he sat her on the bathroom counter and tried to put his "stuff" in her middle part, that is, her "hoo-hoo" between her legs. She did not know what he was trying to do, but it hurt. She said that she could feel it between her legs and inside her and it was squishy. He tried to put it in more than once, but stopped when Connor came in. Sometime later, Johnson did this same thing again, and it hurt.

Jane explained that she did not tell her mother because she was uncomfortable telling her, that she was afraid that her mother would get mad at her, and that she was afraid of what Johnson might do to her. When she told Britni about the "suck the worm" incident, she did not tell her about what happened in the bathroom. Jane decided that she should tell Britni about that incident, too, after she started seeing a counselor at Harold's. Jane denied that she had ever fallen off her bicycle or onto anything that hurt her between her legs.

8

Corwin Scott, Johnson's cousin, testified that, in the 2015-2016 period, he went to Johnson's trailer house to play video games every day. He was there from 9:00 or 10:00 in the morning until around 2:30 in the afternoon, and Jane, Carl, and Connor were also there. In his opinion, Johnson had a great relationship with the children. He also testified that he smoked weed and drank beer while he was at Johnson's residence. Crystal Swanzy, Johnson's ex-wife, testified that Johnson always treated the son they had together and her other two sons well.

Johnson, who was thirty-four years old at the time of trial, testified that he met Rebecca in October 2012 and that he moved in with her and the children in the middle of 2013. While he and Rebecca were dating, he and Steven had a negative interaction over Steven's bothering Rebecca.

Johnson denied that he played "suck the worm" with Jane and denied that he assaulted her in the bathroom. He testified that he had never seen her without clothes, that he never assaulted her, and that he never touched her inappropriately. Johnson said he played Halo with the boys, would take walks with Jane, and generally had a great relationship with the children. At first, Johnson testified that he did not know why they would say what they said about him. But later he testified that he believed that Steven had coerced the children into making the allegations because of the negativity between Steven and him.

Johnson testified that, in April or May of 2016, Rebecca and Jane approached him about Jane going to live with Steven. Johnson consented because he thought she would come back in a few days. The two boys remained living with Rebecca and him. A short time later, Johnson and Rebecca were pushing and shoving each other, and the boys told the neighbors. Johnson was

9

arrested and spent June, July, and August in jail. He pled guilty to felony family violence assault and was placed on community supervision. Although he and Rebecca had a no contact order, when Johnson got out of jail, he went to her house because all of his possessions were there. He testified that, when he got to her house, Carl ran up and hugged him, and Connor greeted him. Rebecca cooked dinner and told him she did not want him to leave.

According to Johnson, that weekend Jane came for a visit and ran up and hugged him. He said that he and Jane played a game hiding her plastic diamond that she called her Precious, and then she went down the road to play with some friends. When Jane wanted to spend the night with her friends, Rebecca consented. When Steven found out, he was irate and immediately came over and picked up Jane.

On cross-examination, Johnson admitted that he had failed drug tests while on community supervision by testing positive for methamphetamine. He testified that he and Rebecca used methamphetamine together either in the car, in a closet, or in the bathroom, but denied using it around the children. He explained that his son, Thomas,[6] tested positive for methamphetamine because it seeped out of Johnson's pores while he was changing Thomas's diaper. Johnson also admitted that he smoked marihuana daily but testified that he did not smoke it around the children.

After examining Johnson about his arrest and criminal record, the State questioned him about the contents of his cell phone. Johnson testified that, when he went to jail, he had his cell phone. He claimed that he and Rebecca watched the pornographic videos together and that she

---

[6]Thomas was born to Johnson and Rebecca in May 2015.

controlled what they watched and for how long. He also testified that the teen sex was Rebecca's favorite. He explained that they would not watch an entire video; rather, Rebecca would watch ten to fifteen seconds of one and then go to another one. He acknowledged that, although Rebecca was in control, they both watched.

The State then read out the graphic descriptions of five videos purporting to involve sex with teenagers, and Johnson acknowledged that he and Rebecca had watched them. Johnson maintained that he only looked at adult websites depicting adults. He denied that he looked at adults made to look like children. He admitted that he called his ex-wife from jail and asked her to get his cell phone. He explained that he did not want what he and Rebecca were looking at to be used against him. On redirect examination, Johnson testified that the videos on his cell phone were from 2017 and that he had purchased the cell phone that year.

## II.     Standard of Review

In his second point of error, Johnson asserts that the trial court abused its discretion in admitting the voluminous evidence of pornography extracted from his cell phone in violation of Rule 403 of the Texas Rules of Evidence. He argues that the evidence was unfairly prejudicial, that it lacked any probative value, and that it caused the jury to convict him on an improper basis.

"Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. While relevant evidence is generally admissible, "[i]rrelevant evidence is not admissible." TEX. R. EVID. 402. Further, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice,

11

confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403.

A trial court's Rule 403 determination is reviewed for an abuse of discretion. *Pawlak v. State*, 420 S.W.3d 807, 810 (Tex. Crim. App. 2013). "[A] trial court does not abuse its discretion when it admits or excludes evidence pursuant to Rule 403 so long as its decision is within the zone of reasonable disagreement." *James v. State*, 555 S.W.3d 254, 260 (Tex. App.—Texarkana 2018, pet. dism'd, untimely filed) (citing *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009)).

When conducting a Rule 403 balancing test, we

must balance (1) the inherent probative force of the proffered evidence along with (2) the proponent's need for the evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by the jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that the presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Holmes v. State*, No. 12-16-00302-CR, 2017 WL 3405205, at \*2 (Tex. App.—Tyler Aug. 9, 2017, no pet.)[7] (mem. op., not designated for publication) (citing *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)). "In any given case, 'these factors may well blend together in practice.'" *Price v. State*, 594 S.W.3d 674, 680 (Tex. App.—Texarkana 2019, no pet.) (quoting *Gigliobianco*, 210 S.W.3d at 642).

---

[7]"Although unpublished opinions have no precedential value, we may take guidance from them 'as an aid in developing reasoning that may be employed.'" *Rhymes v. State*, 536 S.W.3d 85, 99 n.9 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd)).

"Rule 403 favors admissibility, and 'the presumption is that relevant evidence will be more probative than prejudicial.'" *James*, 555 S.W.3d at 260 (quoting *Montgomery*, 810 S.W.2d at 389). Only if the danger of unfair prejudice substantially outweighs the probative value of the evidence will we find that the trial court abused its discretion in admitting the evidence. *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002).

The Texas Court of Criminal Appeals has "held that sexually related bad acts and misconduct involving children are inherently inflammatory." *Pawlak*, 420 S.W.3d at 809 (citing *Montgomery*, 810 S.W.2d at 397). It has "also held that it is possible for the admission of character evidence . . . to cross the line from prejudicial to unfairly prejudicial based on the sheer volume of character evidence admitted." *Id*. at 809–10 (citing *Mosley v. State*, 983 S.W.2d 249, 263 (Tex. Crim. App. 1998); *Salazar v. State*, 90 S.W.3d 330, 336 (Tex. Crim. App. 2002)).

### III.   Analysis

#### A.   The Trial Court Erred When It Admitted the Voluminous Pornographic Images and Websites

Here, the State introduced a DVD as State's Exhibit 4, which contained all of the data extracted from Johnson's cell phone including over 500 pornographic images and the web search history that contained over 400 search results for pornographic websites. The State also introduced State's Exhibit 7, which contained the web history report from the extraction report. At the State's request, Frazier read certain specified entries in State Exhibit 7, all of which were viewed on March 20 or 22, 2017: "Cute, miniature, legal age teenager sex," "Cute, brunette teen casting couch sex for cash with a complete stranger," "F-ing hot teen," and "Horny midget slut picks up guy." The State also introduced State's Exhibit 8, which contained nine pages

13

containing sixty-five pornographic "thumbnail" images and nine pages of selected images that had been enlarged full size, which the State contended depicted images of women made to look like underaged teenagers. The State also elicited testimony from Frazier that some of the images appeared to be "very young looking adult children," but not underage children.

Johnson was on trial for aggravated sexual assault of a young child.[8] The State argues that the pornographic images and graphic descriptions of the websites were admissible (1) to corroborate Jane's outcry statement that she was shown photographs of people "humping" on Johnson's cell phone and (2) to show "that [Johnson] had a predilection for younger looking girls and pornography." Sometimes evidence that the defendant possessed pornography may be probative to corroborate a child sexual assault victim's statement that the defendant showed her pornography before assaulting her. *See Allen v. State*, Nos. 01-10-00652-CR through 01-10-00662-CR, 2012 WL 2106550, at \*4–5 (Tex. App.—Houston [1st Dist.] June 17, 2012, pet. ref'd) (mem. op., not designated for publication) (photograph of cover of a pornographic VHS tape found in defendant's bedroom where assaults occurred).

Here, Jane stated in her outcry that, after one of the assaults, Johnson showed her photographs of people "humping" on his cell phone. This assault is alleged to have occurred in 2015, but Johnson's cell phone did not come into police custody until over two years later. There was also no testimony that the images on the cell phone in 2017 were placed there in 2015. And the only evidence about the websites was that they were viewed in March 2017. So, even if

---

[8]At the time of the 2019 trial, Jane was eleven years old. The offenses were alleged to have occurred in 2015, when Jane was seven years old.

14

some of the images had some probative value in corroborating part of Jane's outcry statement, any such value was weak.

Further, this evidence was not admissible, as the State argues, to show that Johnson had a predilection for younger looking girls and pornography, since "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." TEX. R. EVID. 404(a)(1). In its brief, the State appears to imply that the evidence also showed Johnson's intent to arouse or gratify his sexual desire with young girls. That said, the State makes no argument, and points to no evidence, that shows how these images and the graphic descriptions of websites, all of which involve adult pornography, are relevant to show Johnson's intent to arouse or gratify his sexual desire with young girls. Even the images that the State argued at trial resembled younger teenagers were of post-pubescent women. None of the images and websites involved young children, such as Jane. This evidence, thus, had little, if any, probative value to show that the sexual assaults occurred.

Additionally, the State's need for the evidence was slight. Jane's accounts of the two sexual assaults were corroborated by the testimony of Carl and Connor. Carl testified that he had seen the first assault, and his account generally aligned with Jane's. Connor saw both assaults. He also corroborated Jane's account of the first assault and some parts of the second assault. Further, in Johnson's cross-examination of the children, he only noted the other people in the children's lives that they had not told. Thus, the testimony of the children was much more probative of the charged offenses than the pornographic evidence since the children testified about the sexual assaults, the ultimate issue at trial. *See Pawlak*, 420 S.W.3d at 811. In contrast,

15

Johnson's possession and viewing of pornography was not an issue at trial, and this evidence was only marginally corroborative of a portion of Jane's outcry statement.

The tendency of this evidence to suggest a decision on an improper basis, to confuse or distract the jury from the main issues, and to be given undue weight by the jury, as well the time taken to develop the evidence, also favor inadmissibility. As noted earlier, all the images and descriptions of websites admitted involved adult pornography. Even so, the State emphasized and enlarged those images that it contended depicted young women that looked like they were younger than eighteen and those websites that graphically described sexual acts with teenagers. The State had Frazier read out the names of these websites and had him agree that some of the images appeared to be "very young looking adult children." The State returned to this theme in its cross-examination of Johnson. Thus, although the State's own witnesses testified that all the images and websites depicted adults, the State sought to establish that Johnson had a predilection for young girls. As we noted, the Texas Court of Criminal Appeals has held that sexually related bad acts involving children are inherently inflammatory. *Id.* at 809 (citing *Montgomery*, 810 S.W.2d at 397). As a result, they tend to distract the jury from the main issues, to be given undue weight by the jury, and to suggest that the jury make its decision on an improper basis.

Further, the Texas Court of Criminal Appeals has held that the admission of a voluminous amount of extraneous-offense evidence, such as voluminous amounts of pornographic images, may be "unfairly prejudicial and invite the jury to convict" a defendant of sexually assaulting the victim because he possessed voluminous amounts of pornographic images that included child pornography. *Id.* at 811. Here, the trial court admitted over 500

16

pornographic images, some of which the State contended depicted women who looked like under-age girls, and over 400 websites graphically describing sexual acts, some of which referred to sexual acts with teenagers. Even if some of the pornographic images were admissible, we find under these facts that the trial court abused its discretion when it admitted over 500 pornographic images and over 400 websites graphically describing sexual acts over Johnson's Rule 403 objection.[9] *See id*.

## B.  The Trial Court Error Was Harmful

"Admitting evidence in violation of a Rule of Evidence is considered non-constitutional error." *Akin v. State*, No. 06-14-00178-CR, 2015 WL 5439354, at *6 (Tex. App.—Texarkana Sept. 16, 2015, pet. ref'd) (mem. op., not designated for publication) (citing *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010)); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). If it does not affect a substantial right of the defendant, non-constitutional error must be disregarded. TEX. R. APP. P. 44.2(b); *Warr v. State*, 418 S.W.3d 617, 621 (Tex. App.—Texarkana 2009, no pet.). "Error affects a defendant's substantial right when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Warr*, 418 S.W.3d at 421 (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)). A

---

[9]In its brief, the State cites *Sarabia v. State* in support of its contention that the trial court did not err in admitting the voluminous pornographic images and websites. *Sarabia v. State*, 227 S.W.3d 320 (Tex. App.—Fort Worth 2007, pet. ref'd). *Sarabia* is distinguishable on its facts. In that case, Sarabia was charged with aggravated sexual assault of a twelve-year-old boy. *Id*. at 322. At trial, the court did not admit voluminous pornographic images and websites. Rather, the trial court admitted one pornographic image of a naked child that the victim, S.H., identified as an image that Sarabia had shown him, and two contact sheets of several images of child pornography depicting acts similar to the facts of the offense for which Sarabia was on trial. *Id*. at 322, 324. The Fort Worth Court of Appeals held that the photograph S.H. identified was admissible under Rule 403 because it tended to show that his testimony was truthful and that all the images tended to show Sarabia's intent to arouse of gratify his sexual desire with underage boys because of the similarity of the depicted acts to the acts inflicted on S.H. *Id*. at 324. In addition, the State's need for the evidence was great because S.H., whose credibility was attacked, was the only witness to the assault, and the State did not spend excessive time developing the evidence. *Id.*

conviction will not be overturned for non-constitutional error if, after examining the whole record, we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000) (quoting *Johnson*, 967 S.W.2d at 417).

To assess whether the jury's verdict was improperly influenced by the error, we "consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Baxter v. State*, 66 S.W.3d 494, 499 (Tex. App.—Austin 2001, pet. ref'd); *Warr*, 418 S.W.3d at 621. If they are material to the appellant's claim, we may also consider the jury instruction, the parties' theories, and closing arguments. *Baxter*, 66 S.W.3d at 499; *Warr*, 418 S.W.3d at 621. Also, "whether the State emphasized the error can be a factor." *Motilla v. State*, 78 S.W.3d 352, 356 (Tex. Crim. App. 2002) (citing *King v. State*, 953 S.W.2d 266, 272 (Tex. Crim. App. 1997)).

Here, there was strong, but not overwhelming, evidence of Johnson's guilt. Jane's trial testimony generally followed her outcry statements to Britni. Her testimony about the second alleged assault was also consistent with the patient history she gave to Riddle. In addition, her brothers' testimony generally, but not completely, supported Jane's testimony. The sexual assault examination also matched Jane's testimony about the second alleged assault, but Riddle acknowledged that the white line she concluded was a scar could have also been a normal finding. In addition, neither Jane nor her brothers told anyone about the alleged assaults for almost two years, including those with whom they were in close relationship.

In an apparent attempt to strengthen its case, the State repeatedly sought to show that Johnson's cell phone contained and that Johnson viewed pornography, including pornography involving young-looking girls and possibly child pornography. First, the State introduced the search warrant for Johnson's cell phone and its supporting affidavit over Johnson's objection. The supporting affidavit contained several references to "child pornography" and "child erotica." Hancock testified that her search of the cell phone revealed that it contained a lot of pornographic videos and photographs of people having sexual intercourse. Through Frazier, the State introduced over 500 pornographic images and over 400 websites graphically describing sexual acts. The State then had Frazier read the descriptions from several websites that graphically described sexual acts with teenage girls. With the State's prompting, Frazier also acknowledged that some of the images in State Exhibit 8, which was published for the jury, appeared to be "very young looking adult children."

In its cross-examination of Johnson, the State returned to this theme. It examined Johnson extensively about the pornographic videos he watched. The State emphasized those videos involving younger women and specifically asked Johnson about five websites that graphically described sexual acts with teenage girls.

The State also emphasized the pornography in its final argument.[10] Near the end of its initial argument, the State told the jury:

> I'm going to talk about the pornography now. Again, this is another part of this case that I would rather not get into. I don't like this stuff, but it is what it

---

[10]At the beginning of its final argument, the State informed the jury that it would take all of the evidence back with it and that it would "have plenty of time to spend whatever time [it] need[ed] looking at the SANE report, looking at the photographs, whatever."

19

is. It's part of the case and it's an important part of the case. I'm not going to show anything super-graphic here. There is graphic stuff in evidence and you can look at it, but I just want to talk about it a little bit.

This was the Defendant's cellphone. No doubt about that. It's his cellphone. He was the one accessing the pornography. He tries to put it all off on Rebecca, okay. But it is his phone and it is in his pocket and it has got all that on it. There is lots of pornography on that phone.

We did not print out all 3000 or 4000 pages of this, but you can -- I guess if you're interested, you could go and count how many images there are. You would get well over 500 pornographic images.

Is it a crime to look at adult porn? No. Does somebody who looks at adult porn, does that make them a pedophile? No. But there are some images on there that were very disturbing. We know from his web history that he was accessing teen sex sites, barely legal teen sex sites. And there were also searches for miniature teens and even some searches for midget -- midget sex sites, I guess.

He is telling you there's nothing wrong with that. They are legal. They are legal. There is no problem with that at all. Well, the problem is that the evidence shows that he is not looking for your typical 18-year-old, full-body, grown young woman. He is looking for the 18-year-old that looks like they are 12.

And the reason we offered that evidence is this is evidence of intent, that someone with those kind of pictures and that kind of predilection, that kind of urges and impulse, is much more likely to intentionally assault a young girl. That is why that is important.

Now, can we prove that these young ladies are of legal age or under legal age? No, of course not. We can't prove that, but that's not the point. The point is even if they are 18, is he picking 18-year-olds that look like full-bodied women, or is he picking 18-year-olds that look like little girls? This is what he is into.

And, again, all of this -- all of this goes to his intent. What is he into?

I want to look at one of these in particular, which is this one, here. This girl, right here, and there is Jane Doe. Ladies and gentlemen, this is telling. Because what you have on the left is his fantasy on the Internet, on his phone. And what you have on the right -- the resemblance is uncanny -- is the reality, that is the little 8-year-old girl that's living in his household. His fantasy on the left

and the sad, sick reality of what is living in his house. And we know what happened.

Again, in its rebuttal argument, the State told the jury:

You take a look at those pictures I showed him that he said were okay. Those are pictures, and they may be 18 years old, but they don't look like 18 year olds. And they are all pictures of grown men with their penises on little girls' mouths. Because that is what he is. He is her worst nightmare. And for the rest of her life, that is her reality.

The images and website descriptions from Johnson's cell phone were voluminous and pornographic. The State sought to use this evidence, particularly those images and websites that depicted or referenced younger women, to show that he had a propensity for sexual misconduct with underage girls. As the Texas Court of Criminal Appeals has noted, "[S]exually related bad acts and misconduct involving children are inherently inflammatory,"[11] and should be considered in examining "the potential to impress the jury in some irrational but unforgettable way." *Pawlak*, 420 S.W.3d at 811 (citing *Wheeler*, 67 S.W.3d at 889; *Montgomery*, 810 S.W.2d at 397). The State's emphasis of this evidence through its examination of witnesses and in its final argument compounded the danger that the jury was impressed in an irrational and indelible way.

After examining the evidence as a whole, we do not have a fair assurance that the trial court's error did not influence the jury or that it had but a slight effect. *See Motilla*, 78 S.W.3d at 355. We, therefore, find that the erroneous admission of the voluminous pornographic images

---

[11]Although testimony showed that Johnson's cellphone did not contain any pornographic images of children, the State emphasized certain images and website names to try to convince the jury that they did resemble child pornography.

21

and websites graphically describing sexual acts harmed Johnson.[12]  *See* TEX. R. APP. P. 44.2(b).

We sustain Johnson's second issue.[13]

## III.    Conclusion

For the reasons stated, we reverse the trial court's judgment and remand this case for a new trial.

Scott E. Stevens
Justice

Date Submitted:       August 12, 2020
Date Decided:         October 8, 2020

Do Not Publish

---

[12]In its brief, the State cites our decision in *Akin v. State* in support of its argument that any error by the trial court was harmless.  *Akin v. State*, No. 06-14-00178-CR, 2015 WL 5439354 (Tex. App.—Texarkana Sept. 16, 2015, pet. ref'd) (mem. op., not designated for publication).  *Akin* is distinguishable on its facts.  First, in *Akin*, the trial court did not admit voluminous pornographic images and websites.  Rather, the trial court admitted two photographs of Akin's internet search history and two photographs of two pornographic websites that were actively playing on his computer at the time of its search.  *Id*. at *3.  In addition, essentially the same evidence was shown by the unchallenged testimony of Akin's ex-wife and the police detective who conducted the search of Akin's computer. *Id*. at *6.  Here, Johnson was given a running objection to both the images and websites and to any testimony about them.  Finally, in *Akin*, the State did not emphasize the erroneously admitted evidence either in its examination of witnesses or in its final argument.  *Id*. at *7.

[13]Since our disposition of his second issue requires reversal and remand for a new trial, we need not address Johnson's first issue.

22