**Pedro SALAZAR, Appellant,**

v.

**The STATE of Texas.**

**No. 2180–01.**

Court of Criminal Appeals of Texas.

Nov. 27, 2002.

Walter M. Reaves, Jr., West, for Appellant.

Larissa T. Roeder, Asst. DA, Dallas, Matthew Paul, State's Atty., Austin, for State.

## OPINION

COCHRAN, J., delivered the opinion of the Court, joined by MEYERS, PRICE, WOMACK, JOHNSON and HOLCOMB, JJ.

We granted review in this case to determine whether the court of appeals erred when it held that a seventeen-minute video montage of photographs depicting the murder victim's life, set to music from the movie *Titanic,* was admissible victim-character evidence.[1] *Salazar v. State,* No. 13–00–164–CR (Tex.App.-Corpus Christi 2001) (not designated for publication). We conclude that the court of appeals did err in holding that the videotape's probative value was not substantially outweighed by unfair prejudice under TEX.R. EVID. 403. We therefore reverse the court of appeals and remand the case to that court for it to analyze whether the error in admitting the videotape was harmful under TEX.R.APP. P. 44.2(b).

### I.

A jury convicted appellant, Pedro Salazar, of murder[2] for assisting his co-defendant, David Powell, to assault and kill Powell's rival, Jonathon Bishop. Appellant, a 16–year–old special-education student, was certified to stand trial as an adult.

The State's evidence showed that Jonathon Bishop, age twenty, and David Powell, in his early twenties, went to Brownsville to buy fifty pounds of marihuana. Their relationship deteriorated during the

trip over disputes about the purchase price of the marihuana and the division of costs. Jonathon's girlfriend testified that Jonathon was so mad at Powell when they returned that he talked about burglarizing Powell's house. Jonathon later told her that some of his friends had burglarized Powell's house and stolen money, drugs, and guns, and that Jonathon had set it up. Later, when Powell called Jonathon to do another deal, Jonathon told his girlfriend that Powell was a "sucker because he [Jonathon] had just had [Powell's] house broken into and now they were dealing again."

Powell, however, had traced the burglary back to Jonathon. He told a mutual friend that "Johnny was going to get his. He was going to kill that m_____ f_____." Powell called appellant, and told him that "this guy" thought Powell was a punk. Powell said he would pay appellant a pound of marihuana or $500 to help him beat up or kill the guy. Powell also made the same offer to Danny Diaz. Both agreed to help.

Various witnesses, including appellant, testified that on the morning of the murder, Powell picked appellant up and took him first to Powell's house and then to a Wal–Mart where Powell purchased three baseball bats. Powell and appellant then drove to Danny Diaz's house. Powell explained his plan to the two boys: he would drive Jonathon to Diaz's house, pull the car into the garage, and then, at Powell's signal, all three would attack Jonathon. The murderous attack took place, but not entirely as planned. Jonathon was much

---

1. Specifically we granted the following two questions for review:
   1. Did the Court of Appeals err in holding a video containing numerous pictures of the victim with his family and others, accompanied by emotional music, was properly admissible as victim impact evidence?
   2. Did the Court of Appeals apply the proper standard of review in addressing whether

the probative value of a video containing numerous pictures of the victim with his family and others, accompanied by emotional music, was substantially outweighed by its prejudicial effect?

2. Appellant was charged with capital murder, but convicted of the lesser-included offense.

more formidable than Powell had anticipated; both appellant and Danny Diaz are only about 5'5" tall and weigh about 120 pounds. Jonathon was over six feet tall and weighed 196 pounds. Danny Diaz testified that, after a few punches, he ran into the kitchen, but Jonathon tried to follow him. Someone hit Jonathon over the head with a baseball bat and pulled him back into the garage. Danny Diaz hid in the kitchen for a while. When he opened the garage door, he saw appellant stepping on Jonathon's neck while David Powell strangled Jonathon with a piece of wire. Afterwards, Powell and appellant put Jonathon's body in the trunk of Powell's car, while Danny Diaz cleaned up the blood in the garage. Powell drove off to dispose of the victim's body, while Danny Diaz drove appellant home and gave him $100.

At the punishment stage, the State first called Jonathon Bishop's mother, Jill Bishop. She testified briefly about Jonathon's youth, which he spent with her in California and Dallas, until he moved out when he was seventeen. She stated:

> He was always there for me when I was having a bad day. I remember many times with him coming up and putting his hands on my face and telling me, mommy, mommy, things will be okay. He was just a sweet boy with a very vibrant personality. I guess if I had to describe him, he was obviously very handsome and had a great personality. When he walked into the room, the room would light up. He loved his family.

Next, Jonathon's father, Jeffrey Bishop, testified. He said that he lived with Jonathon until his son was fourteen; then he and Jonathon's mother divorced. He stated that he had spent several days compiling old photographs of Jonathon to make a video to show at his son's memorial service. The State then offered that video, State's Exhibit 118, into evidence.

Appellant's attorney objected: "Judge, we have never seen this exhibit before, so we would ask just to be permitted to examine it so we can make any objections we have, I have no idea what's on this exhibit." The judge immediately responded: "Overruled, It's admitted." The State then played the seventeen-minute videotape.

State's Exhibit 118 is included in the appellate record and we have viewed it. This video is an extraordinarily moving tribute to Jonathon Bishop's life. It consists of approximately 140 still photographs, arranged in a chronological montage. Music accompanies the entire seventeen-minute video and includes such selections as "Storms in Africa" and "River" by Enya, and concludes with Celine Dion singing, "My Heart Will Go On," from the movie *Titanic*.

Almost half of the approximately 140 photographs depict the victim's infancy and early childhood. The pictures show an angelic baby, surrounded by loving parents, grandparents, unidentified relatives, and other small children. Later photographs show Jonathon as a toddler, playing the piano, frolicking at the beach with other friends, happily riding on a carousel, laughing in a field of bluebonnets, and cuddling with a puppy. The video also includes numerous annual school pictures showing Jonathon's progression from a cheerful child to a equally cheerful young man. It catalogs his evident and early prowess as a young soccer player and eventually as a football player. There is a picture of him and his date, presumably going to their prom, and more candid shots of the victim and his teen-age buddies. The video includes many family reunion portraits showing Jonathon's entire extended family. Understandably, this professional and polished production portrays Jonathon in a very positive light and it is

entirely appropriate for a memorial service. The music, too, is appropriately keyed to the various visuals, sometimes soft and soothing, then swelling to a crescendo chorus. In sum, it is a masterful portrait of a baby becoming a young man. It is also extraordinarily emotional.

Immediately after showing the memorial videotape, the State called appellant's high school principal to offer appellant's high school detention records. Again, appellant's attorney objected, and again he stated that he had never seen these school records, despite the judge's discovery order allowing pretrial access to all exhibits. Counsel then renewed his objections to Exhibit 118:

It violates all of the rules of discovery. It violates Rules 401, 402, 403, 404 of the Texas Rules of Criminal Evidence. It's not relevant to this case. The proper predicate was not laid for any video or audio tapes to be admitted.

Another motion that we filed earlier this week that was granted by the Court was for us to look at and examine any video or audio tape, whereas at that time the State said they had none. We relied on the State—I guess improperly so, relied on the State's representations to us....

The admission of that exhibit is highly prejudicial and outweighs any probative value. The music, the somber music in the background violates any admission, any predicate.... After the admission of that exhibit, Your Honor, there's absolutely no way this Defendant can get a fair trial, absolutely no way. And we would respectfully ask that the Court instruct the jury to disregard any viewing, any listening of State's Exhibit Number 18[sic] in its entirety.

The judge responded: "Your objection is overruled." Appellant's counsel then asked for a mistrial and was overruled. Counsel continued:

Again, we would state for the Record that with my 30 years of experience in trying criminal cases, I've never seen the State admit such an exhibit, either in the guilt/innocence phase or in the punishment phase. And I can testify that from this point on, there's absolutely no way Pedro Salazar can get a fair trial during the pendency of the rest of this trial.

The judge ended the bench conference by stating:

The Court does not believe that even if there were any error in the admission of the tape, that it would be harmful to the Defendant. I believe—the Court believes that if there was any error, and it does not concede that there was, that it was harmless error.

The punishment testimony continued and the State offered evidence that appellant had once thrown rocks from a bridge and called a teacher a bad name. There was no evidence of any other prior assaultive behavior, no evidence that appellant was a gang member or did drugs. The defense offered evidence that appellant was a "slow" special-education student who was easily influenced, but much loved by his family.

The jury sentenced appellant to 35 years imprisonment and assessed a $10,000 fine. On appeal, the Corpus Christi Court of Appeals upheld the video montage's admission as victim impact evidence, held that the trial court abused its discretion in admitting the audio portion, with its "emotional music," but concluded that the error in admitting the audio portion was harmless.[3] We granted review to determine

3. *Salazar,* slip op. at 10–11.

whether the video montage, with its background music, was admissible as victim-impact evidence and whether the court of appeals applied the proper Rule 403 analysis.

### II.

■ As a general proposition, victim-impact evidence may be admissible at the punishment stage of a criminal trial when that evidence has some bearing on the defendant's personal responsibility and moral culpability.[4] As the Supreme Court stated in *Payne v. Tennessee,*[5] such evidence is "designed to show … *each* victim's 'uniqueness as an individual human being,'"[6] and is a way to inform "the sentencing authority about the specific harm caused by the crime in question."[7] Such evidence is of two distinct, but related, types: victim *character* evidence and victim *impact* evidence.[8] The former is designed to give the jury "a quick glimpse of the life that the petitioner chose to extinguish, to remind the jury that the person whose life was taken was a unique human being."[9] The latter is designed to remind the jury that murder has foreseeable consequences to the community and the victim's survivors—family members and friends who also suffer harm from murderous conduct.

■ Defendants are not nameless, faceless ciphers in the courtroom.[10] They are physically present and able to offer a human face and evidence of their humanity. But both defendants and juries must also know that the homicide victim is not a faceless, fungible stranger.[11] Every homicide victim is an individual, whose uniqueness the defendant did or should have considered, regardless of whether the murderer actually knew any specific details of the victim's life or characteristics.[12]

On the other hand, the punishment phase of a criminal trial is not a memorial

---

4. *Mosley v. State,* 983 S.W.2d 249, 261–62 (Tex.Crim.App.1998);

5. 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (emphasis in original). Although *Payne* concerned victim character and impact evidence offered at the punishment stage of a capital murder trial, its logic applies equally to non-capital cases. The Supreme Court stated that "[a] State may legitimately conclude that evidence about the victim and about the impact on the murder victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 827, 111 S.Ct. 2597. Texas has recognized the relevancy of such victim evidence in non-capital cases. *See Stavinoha v. State,* 808 S.W.2d 76, 78–79 (Tex.Crim.App. 1991) (holding that victim-impact evidence is admissible in a non-capital case when it has some bearing on defendant's personal responsibility and moral guilt); *Miller–El v. State,* 782 S.W.2d 892, 896–97 (Tex.Crim.App. 1990); *Moreno v. State,* 38 S.W.3d 774, 777 (Tex.App.-Houston [14th Dist.] 2001, no pet.)(plurality op.) (relying on *Stavinoha* and holding that victim-impact evidence is relevant and admissible when it bears on defendant's personal responsibility and moral culpability); *Brooks v. State,* 961 S.W.2d 396, 399 (Tex.App.-Houston [1st Dist.] 1997, no pet.) (relevance of victim-impact testimony in non-capital case requires that such evidence have a "close, direct link to the circumstances of the case").

6. *Payne v. Tennessee,* 501 U.S. at 823, 111 S.Ct. 2597.

7. *Id.* at 825, 111 S.Ct. 2597.

8. *See generally Mosley v. State,* 983 S.W.2d at 261–62 (discussing and distinguishing "victim impact" evidence from "victim character" evidence).

9. *Payne v. Tennessee,* 501 U.S. at 830–31, 111 S.Ct. 2597 (O'Connor, J., concurring) (citation omitted).

10. *Id.* at 838, 111 S.Ct. 2597 (Souter, J., concurring).

11. *Id.*

12. *See id.*

service for the victim. What may be entirely appropriate eulogies to celebrate the life and accomplishments of a unique individual are not necessarily admissible in a criminal trial. Thus, this Court, in *Mosley v. State,* held:

> Trial judges should exercise their sound discretion in permitting *some* evidence about the victim's character and the impact on others' lives while limiting the amount and scope of such testimony. Considerations in determining whether testimony should be excluded under Rule 403 should include the nature of the testimony, the relationship between the witness and the victim, the amount of testimony to be introduced, and the availability of other testimony relating to victim impact and character....

> At the same time, *we caution that victim impact and character evidence may become unfairly prejudicial through sheer volume.* Even if not technically cumulative, an undue amount of this type of evidence can result in unfair prejudice under Rule 403. Hence, *we encourage trial courts to place appropriate limits upon the amount, kind, and source of victim impact and character evidence.*[13]

■ When considering the admissibility of victim impact or victim character evidence, courts must carefully consider the following factors:

(1) how probative is the evidence;

(2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way;

(3) the time the proponent needs to develop the evidence; and

(4) the proponent's need for the evidence.[14]

■ These are simply the normal evidentiary rules that courts apply in any Rule 403 admissibility determination, including the admissibility of victim impact evidence at the punishment phase.[15] As we noted in *Mosley,* there is no legal "bright and easy line" for deciding precisely what evidence is and is not admissible as either victim character or victim impact evidence.[16] The inability to craft a bright-line rule, therefore, requires heightened judicial supervision and careful selection of such evidence to maximize probative value and minimize the risk of unfair prejudice. Courts must guard against the potential prejudice of "sheer volume,"[17] barely relevant evidence, and overly emotional evidence. A "glimpse" into the victim's life and background is not an invitation to an instant replay.[18]

### III.

■ In the present case, appellant's attorney stated that he had never even seen the memorial videotape before the State offered it into evidence. There is no indication on the record that the trial judge had previewed it, either. It is, of course, impossible for any party to make an intelligent objection to evidence that he has not

---

**13.** 983 S.W.2d at 262–63 (emphasis added).

**14.** *Solomon v. State,* 49 S.W.3d 356, 366 (Tex. Crim.App.2001); *Reese v. State,* 33 S.W.3d 238, 240 (Tex.Crim.App.2000).

**15.** *Mosley,* 983 S.W.2d at 262–65.

**16.** *Id.* at 262.

**17.** *Id.* at 263.

**18.** *See, e.g., State v. Bernard,* 608 So.2d 966, 972 (La.1992) (lengthy, detailed description of the good qualities of the victim "treads dangerously on the possibility of reversal" because it goes "beyond the purpose of showing the victim's *individual* identity" and increases "the influence of arbitrary factors on the jury's sentencing decision").

seen. It is equally difficult for a trial judge to weigh the probative value against the potentially unfair prejudice of a particular item of evidence without first reviewing it. Thus, appellant's attorney could not make a relevancy or Rule 403 objection until after the jury had already seen the seventeen-minute tape, nor could the judge make any discretionary ruling under Rule 401 or 403 until after the jury had viewed the exhibit.[19] The cart came before the horse. Although the trial court's failure to permit the defense to view the exhibit before ruling on its admissibility was clearly error, it would be harmless error if, indeed, the exhibit were fully admissible. It was not.

The court of appeals noted that although "the probative value of the pictures as to [the effect of the offense upon the victim's family] might be slight, we hold that evidence of the harm with respect to the pictures alone is also slight."[20] The admissibility issue, however, is not harm; it is ultimately whether the unfair prejudicial effect of the approximately 140 photographs substantially outweighed their probative value. Tex.R. Evid. 403. That determination must be made by applying the four factors set out in *Solomon*: the probative value of the evidence; its potential for unfair prejudice; the time needed to put on the evidence; and the proponent's need for the evidence.[21] Trial judges deserve the greatest deference when they have explicitly weighed and balanced these four factors, and articulated their rationale for admitting or excluding the evidence.

We agree with the court of appeals that the probative value of the video montage was minimal, but we disagree that the risk of unfair prejudicial was also slight. Nearly half of the photographs showed Jonathon Bishop as an infant, toddler or small child, but appellant murdered an adult, not a child. He extinguished Jonathon Bishop's future, not his past. The probative value of the vast majority of these "infant-growing-into-youth" photographs is *de minimis*. However, their prejudicial effect is enormous because the implicit suggestion is that appellant murdered this angelic infant; he killed this laughing, light-hearted child; he snuffed out the life of the first-grade soccer player and of the young boy hugging his blond puppy dog. The danger of unconsciously misleading the jury is high. While the probative value of one or two photographs of an adult murder victim's childhood might not be substantially outweighed by the risk of unfair prejudice, what the State accurately characterizes as a "seventeen-minute montage" of the victim's entire life is very prejudicial both because of its "sheer volume," and because of its undue emphasis upon the adult victim's halcyon childhood. Because the probative value of much of the video montage is low and the potential for unfair prejudice high, these two factors weigh against admissibility.

The third factor, the time required to develop this evidence, also weighs against admissibility. Here, both parents testified in person and spoke briefly, but eloquently, of their love for Jonathon, his individuality, his childhood and youth, his love of life, and of their personal loss and grief. Mrs. Bishop's testimony was three record pages long, while Mr. Bishop's was two pages. Their testimony was fully admissi-

---

**19.** We generally will not "second guess the trial court's determination" that a tape recording is "not needlessly cumulative or more prejudicial than probative" precisely because the trial judge *has* reviewed offered exhibits and explicitly or implicitly balanced probative value against the Rule 403 counterfactors.

*See Webb v. State,* 760 S.W.2d 263, 276 (Tex. Crim.App.1988).

**20.** *Salazar,* slip op. at 9.

**21.** *Solomon,* 49 S.W.3d at 366.

ble. Mrs. Bishop had also testified as the State's first witness during the guilt stage and authenticated a photograph of Jonathon as he looked around the time of his death. This photograph was clearly relevant and admissible. The memorial video, on the other hand, was very lengthy, highly emotional, and barely probative of the victim's life at the time of his death.

The State's need for this evidence was also minimal.[22] Both parents were available to testify and both did so. Their testimony was eloquent and brief. Because Mr. Bishop compiled the photographs for the memorial videotape, the State could have offered a small number of those photographs through him.[23]

█ In close cases, courts should favor the admission of relevant evidence.[24] This is not a close case. None of the Rule 403 factors weighs in favor of admissibility, but rather all weigh against admissibility. Thus, we are constrained to hold that the trial judge erred in admitting the video memorial. That is not to say that all victim-impact or victim-character videotapes would necessarily be inadmissible under Rule 403,[25] but merely that this particular exhibit should not have been admitted in its entirety.[26]

The State acknowledges that the video was "accompanied by irrelevant background music," but argues that it was not so "unduly prejudicial that it rendered appellant's trial fundamentally unfair." That, however, is not the correct test. Appellant properly objected under Rules 401

---

**22.** In *Reese v. State*, 33 S.W.3d 238, 242 (Tex. Crim.App.2000), this Court identified three subfactors to consider when evaluating the State's need for victim related evidence:

1) Does the proponent have other available evidence to establish the fact of consequence that the evidence is admissible to show.

2) If so, how strong is that other evidence? And

3) Is the fact of consequence related to an issue in dispute?

33 S.W.3d at 242. All three factors weigh against the admissibility of the videotape. Mrs. Bishop testified about her son's childhood, his various activities, and what he liked to do. She related Jonathon's love for his family, his influence upon his younger brother who had cerebral palsy, and she spoke of how all his family and friends missed Jonathon.

**23.** *See Solomon*, 49 S.W.3d at 365 (upholding admissibility of seven photographs of murder victim showing his wedding, dressed in his sailor's uniform, his children, and scenes of victim swimming with his children).

**24.** *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex.Crim.App.1990) (op. on reh'g).

**25.** *Compare United States v. McVeigh*, 153 F.3d 1166, 1221 n. 47 (10th Cir.1998) (up-

holding admission of limited victim-impact testimony from the Oklahoma City bombing, and noting that "the district court prohibited the introduction of wedding photographs and home videos"); *State v. Allen*, 128 N.M. 482, 505, 994 P.2d 728, 751 (1999) (upholding admission of three minute videotape of victim taken during elk-hunting trip a few months before murder); *Hicks v. State*, 327 Ark. 727, 730–31, 940 S.W.2d 855, 857 (1997) (upholding admission of 14–minute victim character videotape—consisting of photos of the victim, his children, and friends—because the trial court "carefully reviewed and closely monitored the videotape shown" and "carefully spelled out the probative value of the tape and its intended purpose to show a side of [the victim] different from the one described" by the defendant as being the first aggressor and a person who had previously fought, cursed, and used weapons in earlier altercations); *Whittlesey v. State*, 340 Md. 30, 86, 665 A.2d 223, 250 (1995) (affirming admission of 90 second videotape of victim playing the piano, noting that this was a skill for which victim was nationally recognized).

**26.** A trial judge would not necessarily abuse his discretion in ordering that such a videotape be edited to remove most of the infant and childhood pictures while retaining those showing the victim at or around the time of his death.

and 403.[27] The video itself was not admissible and the Enya and Celine Dion background music greatly amplifies the prejudicial effect of the original error.

■ In sum, we hold that the court of appeals erred in concluding that the visual portion of the memorial videotape was admissible victim-character or victim-impact evidence. The court of appeals had also held that the audio portion of the exhibit was not admissible, but that the error in admitting the musical accompaniment was harmless under Tex.R.App. P. 44.2(b). That is the correct standard of review by which to analyze the erroneous admission of State's Exhibit 118. However, the court of appeals analyzed only the impact of the background music, not the impact of the entire video tape, upon the punishment phase. Therefore, we reverse and remand the case to the court of appeals to apply its harmful error analysis to both the visual and audio portions of State's Exhibit 118.

KELLER, P.J., filed a concurring opinion, joined by HERVEY, J.,
HERVEY, J., joined Parts I and II of the Court's opinion and joined the concurring opinion.

KEASLER, J., concurred in the result.

KELLER, P.J., filed a concurring opinion in which HERVEY, J. joined.

In *Mosley v. State,* we found that victim impact and character evidence is relevant to the mitigation special issue at the punishment stage of a capital murder trial "to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence." [1] We held that this type of evidence is admissible at punishment subject to the limitations of Texas Rule of Evidence 403. We stated that Rule 403 would be violated if "the focus of the evidence shifts from humanizing the victim and illustrating the harm caused by the defendant to measuring the worth of the victim compared to other members of society." [2] We further cautioned that trial judges should carefully screen testimony to limit the amount and type of evidence admitted to reduce the risk of unfair prejudice:

> We recognize that this standard does not draw a bright and easy line for determining when evidence concerning the victim is admissible and when it is not. Trial judges should exercise their discretion in permitting some evidence about the victim's character and impact on others' lives while limiting the amount and scope of such testimony.... [W]e caution that victim impact and character evidence may become unfairly prejudicial through sheer volume. Even if not technically cumulative, an undue amount of this type of evidence can result in unfair prejudice under Rule 403. Hence, we encourage trial courts to place appropriate limits upon the amount, kind, and source of victim impact and character evidence.[3]

*Mosley* 's reasoning also applies to the punishment phase of a non-capital trial. Non-capital sentencing calls for an inquiry similar to that conducted in evaluating the mitigation special issue. Both involve open-ended normative assessments of the defendant's moral blameworthiness and of

---

27. Although appellant's objection was made *after* the video was displayed to the jury, it was not untimely because it was made as soon as appellant had actually seen the contents of the exhibit. He cannot be faulted for failing to make an objection to evidence sight unseen. TEX.R. EVID. 103(a)(1).

1. 983 S.W.2d 249, 262–263 (Tex.Crim.App. 1998), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999).

2. *Id.* at 262.

3. *Id.* at 262–263.

whether he deserves a particular punishment. Non-capital sentencing is also susceptible to the same potential prejudice inherent in the admission of victim-related evidence—that the evidence may shift the focus of the trial from the defendant's culpability to the victim's worth. I agree with the Court that *Mosley* applies to non-capital sentencing proceedings.

Turning to the evidence presented here, I would hold that the seventeen-minute video montage containing approximately 140 still photographs set to music was unduly prejudicial under Rule 403 and ran afoul of the cautions given in *Mosley*. The Court of Appeals was correct to hold that the music was unnecessary and should not have been allowed. But it is also true that the sheer volume of the photographic evidence was far more than required to satisfy the purposes of introducing victim impact and character evidence, and the evidence was presented in a manner designed to have an unduly emotional impact.

With these comments, I concur in the Court's judgment.