COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| DANIEL MICHAEL ATHENS, | § | No. 08-19-00195-CR |
| Appellant, | § | Appeal from the |
| v. | § | 346th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20150D01963) |

## **O P I N I O N**

Appellant Daniel Michael Athens was convicted by a jury of the lesser-included offense of robbery after being indicted for aggravated robbery. The jury assessed twenty years' confinement as punishment. On appeal, Athens brings three evidentiary issues: one complaining of show-up identification testimony admitted during the guilt-innocence phase of trial; and two contesting extraneous offense evidence presented during the punishment phase. As to the extraneous offense evidence, Athens contends the trial court erred in admitting an out-of-court statement of a non-testifying witness over his complaint of Confrontation Clause violation, and further erred in permitting needless presentation of improper victim impact evidence. Finding no error, we affirm the trial court's judgment.

## I. BACKGROUND

On the morning of April 6, 2015, Ruben Serros worked at Walmart on Dyer Street as a loss-prevention officer. While viewing live images from surveillance cameras in the store, Serros noticed a shopper, later identified as Athens, wearing khaki shorts and a blue long-sleeved shirt. Serros observed as Athens placed several items into his shopping cart. Serros then watched as Athens walked with his cart through several aisles, into the garden center, past the cash register, and exited the store. After Athens had exited without paying, Serros approached Athens and identified himself as Walmart security. As Serros requested he return to the store, Athens pulled out a knife. Fearing he would be harmed, Serros allowed Athens to leave. As Athens walked away, Serros called 911 to report the incident. During his call, he gave a description of Athens, how he was dressed, and what direction he went.

Responding to the call, Officers Giovanni Santiago and Corey Gadra canvased the area looking for the subject of the call. When they located a person matching the description given by Serros, they approached and asked if he had any weapons. The person, who they identified as Athens, responded that he had thrown the knife away. Officer Santiago then placed him in handcuffs for safety purposes. Officer Gadra placed Athens in the backseat of the patrol car.

Also responding to the call, Detective Zachary Kiesel arrived at Walmart to meet with Serros. After hearing on the radio that patrol officers had stopped a subject matching the description given by dispatch, Detective Kiesel drove Serros to the location of the officers to conduct a show-up identification.[1] Following completion of the show up, Officers Santiago and

---

[1] Detective Kiesel testified a "show-up" is when you give a person an opportunity to determine if the person being shown is the one that was involved in the incident or not.

Gadra placed Athens under arrest. Detective Kiesel then transported Serros back to Walmart to retrieve the security video and a list of the property. Athens was later indicted on one count of aggravated robbery.

During the guilt-innocence phase of trial, the jury heard testimony from Serros, Detective Kiesel, Officer Santiago, Officer Gadra, and the 911 custodian of records for the El Paso Police Department. During Serros' testimony, he identified Athens as the individual who "pulled the knife on [him]." Additionally, the 911 call made by Serros was admitted into evidence. Also, two videos were admitted as evidence and played for the jury. The videos contained the security surveillance footage from Walmart in which Serros observed Athens and later approached him when Athens attempted to leave the store. Following one day of testimony, the jury returned a verdict of not guilty of aggravated robbery but found Athens guilty of the lesser-included offense of robbery.

In the punishment phase of trial, the State admitted evidence of prior offenses and other bad acts. Prior offenses included: a conviction for possession of marijuana in 2011; a conviction for criminal mischief in 2013; and a conviction for burglary of a vehicle in 2013. As for other bad acts, the State presented multiple witnesses who testified about two post-robbery incidents which implicated Athens occurring on the same day, December 20, 2015. Based on the issues presented, only two of the multiple witnesses who testified at trial are relevant to this appeal. First, Steven Lask, a former Army Captain, testified about a conversation he had with Athens' mother in which she described to Lask that her fiancé had just been shot by her son. Second, Marisa Carbajal Moller (Carbajal), who had been dating Athens, testified in detail about Athens coming to her home, beating her with multiple items including a broomstick, threatening her with a knife, and causing her multiple injuries. As to these two witnesses, we expand on the details of their testimony in our

3

discussion below.

At the conclusion of the punishment phase, the jury returned a punishment verdict of twenty years' confinement in the Institutional Division of the Texas Department of Criminal Justice with a fine of $10,000, which the trial court imposed as the sentence. This appeal followed.

## II. DISCUSSION

In three issues on appeal, which are shown in the order presented, Athens contends: (1) the trial court erred in admitting an out-of-court statement during the punishment phase of trial in violation of the Confrontation Clause, (2) the trial court erred in denying his motion to suppress which alleged that officers had used an unnecessarily suggestive procedure which caused an irreparable misidentification of Athens in violation of his rights to due process and due course of law, and (3) the trial court erred in admitting extraneous offense victim impact evidence during the punishment phase.

Proceeding out of order, we address Athens' second issue first.

### A. Witness Identification

In his second issue, Athens contends the trial court erred in denying his motion to suppress "an unnecessary suggestive procedure which caused an irreparable misidentification" in violation of his due process and due course of law rights. Specifically, Athens argues the show-up identification by Serros was unnecessary. He argues the officers simply made no effort to construct a proper lineup.

*1. Standard of Review*

A trial court's denial of a motion to suppress is reviewed under a bifurcated standard of review. *Baird v. State*, 398 S.W.3d 220, 226 (Tex. Crim. App. 2013). As the trial court is the

4

exclusive trier of fact, we defer to the trial court's express and implied findings of fact. *Id*. The trial court is the sole judge of credibility of witnesses and determines what weight to give to their testimony. *Id*. However, we review *de novo* the legal significance of those facts and the application of the law to the facts. *Id.*; *see also Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). We sustain the trial court's ruling on a motion to suppress if it is reasonably supported by the record and correct on any applicable theory of law. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003); *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007).

## 2. Applicable Law

Pretrial identification procedures can be so impermissibly suggestive and conducive to mistaken identification that the subsequent use of that identification at trial would deny the accused due process of law. *Barley v. State*, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995). Texas courts generally condemn the use of one-man, infield show-ups because of their suggestive nature; however, courts also recognize admission of such identification evidence is not a *per se* violation of defendant's due process rights. *Knott v. State*, 513 S.W.3d 779, 786-87 (Tex. App.—El Paso 2017, pet. ref'd) (citing *Garza v. State*, 633 S.W.2d 508, 512 (Tex. Crim. App. [Panel Op.] 1982)). "The due process clause of the Fourteenth Amendment does not compel the exclusion, apart from any consideration of reliability, of pre-trial identification evidence obtained by a police procedure that was both suggestive and unnecessary." *Jackson v. State*, 657 S.W.2d 123, 130 (Tex. Crim. App. 1983).

In determining whether a defendant's due process rights were violated by the admission of a witness's identification testimony that was allegedly tainted by a suggestive pretrial identification procedure, we first examine whether the identification itself was impermissibly

suggestive. *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993). If the identification procedure was suggestive, we then determine whether the suggestive nature of the procedures gave rise to a substantial likelihood of irreparable misidentification. *Id*. The second step is the most critical step because even if unnecessarily suggestive identification procedures were used by police, the identification testimony may nevertheless be admissible if there is evidence that the witness's identification was the product of an independent source. *Jimenez v. State*, 787 S.W.2d 516, 520 (Tex. App.—El Paso 1990, no pet.). If an independent origin is shown, we may conclude that the pretrial identification procedure did not result in a substantial likelihood of misidentification. *Id*.

"In making this determination, we consider the totality of the circumstances, relying on, among other things, the following five factors: (1) the witness's opportunity to view the suspect at the time of the offense; (2) the degree of attention the witness focused on the suspect at the time of the offense; (3) the accuracy of any descriptions provide by the witness prior to the allegedly suggestive identification procedure; (4) the witness's level of certainty of his identification; and (5) the time between the crime and the identification procedure." *Knott*, 513 S.W.3d at 787 (citing *Garza*, 633 S.W.2d at 513). These factors, along with others, are weighed against the corrupting effect of the suggestive identification. *Delk*, 855 S.W.2d at 706. The defendant bears the burden to show, by clear and convincing evidence, that the pretrial identification procedure was impermissibly suggestive. *Balderas v. State*, 517 S.W.3d 756, 792 (Tex. Crim. App. 2016). "The due process clause of the Fourteenth Amendment does not compel the exclusion, apart from any consideration of reliability, of pre-trial identification evidence obtained by a police procedure that was both suggestive and unnecessary." *Jackson*, 657 S.W.2d at 130.

6

*3. Analysis*

Prior to trial, Athens filed a motion to suppress the identification of him as the perpetrator through a show-up identification conducted by police. At the hearing on the motion, Detective Kiesel testified in detail about the show-up identification. On arrival at the Walmart, Detective Kiesel met with Serros, the loss prevention employee who reported the incident. Meanwhile, Officers Santiago and Gadra were also checking the area at the same time. Serros gave a brief description of what had happened. Soon, Detective Kiesel received word that the other officers had stopped somebody matching the physical description of the person who had threatened Serros and taken property without paying. Detective Kiesel then transported Serros to where the suspect was being held, a couple blocks away from the store, to see if he could identify the assailant. Detective Kiesel parked close enough to the patrol car with the suspect, but not so close to where the suspect would be able to see Serros. He and Serros remained in his unmarked vehicle.

Pursuant to the department's procedures, Detective Kiesel gave Serros a show-up duty form to fill out and he read instructions to him. Detective Kiesel testified Serros identified Athens as the assailant and filled out the show-up form accordingly. Detective Kiesel testified he merely gave instructions to Serros which informed him that he did not have to make an identification. Afterwards, he gave Serros a ride back to Walmart and requested he go to the police station to give a statement. At the hearing, the State also admitted the police dispatch record of Serros' call and the show-up form he completed. The call record showed that Serros had identified the suspect as wearing a blue long-sleeved shirt and khaki shorts. On the show-up form, Serros had written: "I identify the person 100%[;] that he is in a blue shirt and shorts with sunglass[es]." The trial court denied the motion to suppress the show-up identification. No findings of fact or conclusions of

law were requested or filed by the court.

Athens asserts the one-person show-up conducted by the police rendered it impermissibly suggestive because, when Serros arrived at the location of the show-up, Athens was detained in handcuffs, surrounded by officers, and removed from a marked police vehicle before the identification. Athens relies on this Court's decision in *Knott* to assert the identification procedures used in his case were impermissibly suggestive. *See Knott*, 513 S.W.3d at 788. Like in *Knott*, we must determine here whether Serros' testimony was sufficiently reliable to allow its admission at trial despite the suggestive nature of the show-up itself. *Id.*

a. *Application of the Five-Factor Test*

The first factor rests on Serros' opportunity to view the suspect. *Garza*, 633 S.W.2d at 512-13; *Knott*, 513 S.W.3d at 787. Serros testified that he was able to view Athens through the security surveillance camera and he stood right in front of Athens when he tried to detain him after he had exited the store. The surveillance video containing the footage of Athens was over ten minutes long and Serros testified he was watching as it was happening. Serros also indicated that the face-to-face encounter at Walmart was in a well-lit area, and he looked Athens in the face. We conclude that Serros had sufficient opportunity to view Athens both before and during the robbery. *Garza*, 633 S.W.2d at 512-13 (finding identification was reliable where the witness observed defendant from only ten yards away); *Knott*, 513 S.W.3d at 788 (finding witness had opportunity to view the suspect where he encountered the defendant twice, spoke to the defendant, defendant stood directly in front of him, and the area was well lit).

The second factor is the degree of attention that Serros focused on the suspect. *Garza*, 633 S.W.2d at 512-13; *Knott*, 513 S.W.3d at 787. Athens asserts that because Serros' testimony

8

focused on the interaction and the knife, his focus could have been on how the suspect acted rather than what he looked like. However, Serros' testimony and description support that he clearly looked at Athens and focused on his appearance. We find there is no evidence in the record to show that Serros' attention was diverted, or that he was unable to focus on the suspect either before or after the crime occurred. This factor weighs in favor of finding the identification reliable. *Knott*, 513 S.W.3d at 789 (finding there was nothing in the record to show witness's attention to the suspect was diverted before or after the crime occurred).

The third factor is the accuracy of Serros' description of the suspect prior to the show-up. *Garza*, 633 S.W.2d at 512-13; *Knott*, 513 S.W.3d at 787. Serros gave a detailed description in his 911 phone call that described the suspect as a white male in his late thirties, approximately 5' 10" tall, with short blond hair, blue eyes, and wearing khaki shorts and blue-long sleeved shirt. Serros also identified the suspect as carrying a notebook with the name "Danny" written on it and a knife that looked like a steak knife with an orange handle. Athens was then detained based on the description given by Serros.

Athens argument rests on Serros' failure to fully describe the suspect in his subsequent statement to police. Following Serros' identification of Athens at the show-up, Serros went to the police station to give a written statement but did not describe what Athens was wearing in the written statement. Athens argues that because the description in Serros' post show-up identification statement did not match the previous descriptions, his description was inaccurate. Athens does not argue that the descriptions, at any point, did not accurately describe Athens. In fact, Serros' description did accurately describe Athens and was sufficiently accurate to ensure the reliability of identification. *Garza*, 633 S.W.2d at 513 (finding any discrepancies in the witness's

9

testimony went weight of evidence, not its admissibility); *Knott*, 513 S.W.3d at 790 (finding, even with a few discrepancies, the description of the suspect was sufficiently accurate).

The fourth factor is the certainty of Serros' identification of Athens as the suspect. *Garza*, 633 S.W.2d at 512-13; *Knott*, 513 S.W.3d at 787. At the time of the show-up, Detective Kiesel stated that he believed Serros was "very certain" in his identification at the time. Serros also testified he was 100% certain because he does not forget faces and stated he was 100% certain on the show-up form he signed. Athens does not challenge Serros' certainty in the identification of Athens but instead focuses on Serros' certainty of other details surrounding the identification. Athens attempts to discredit Serros' identification in contending Serros' testified he knew Athens was the assailant because he does not "forget faces." Athens points out that when asked to describe the officer who picked him up to transport him to the show-up identification, Serros could not remember what the officer looked like, and further could not describe what the other officers looked like. Additionally, Athens asserts that Serros could not remember what the officers looked like and his memory was incorrect regarding the type of vehicle he was transported in and whether the officers who detained Athens were wearing uniforms. Any discrepancies in Serros' testimony regarding other people would go to the weight of Serros' testimony and not whether the identification is admissible. *Garza*, 633 S.W.2d at 512-13. The trial court was able to discredit the discrepancies in Serros' certainty of other factors but nonetheless find that his certainty regarding Athens remained consistent. *Baird*, 398 S.W.3d at 226. Athens failed to disprove Serros' level of certainty was extremely high or unwavering, therefore this factor weighs in favor of reliability. *Knott*, 513 S.W.3d at 790.

The final factor is the length of time between the crime and the identification procedure.

10

The shorter the time period between the crime and the identification, the more reliable the identification will be. *Garza*, 633 S.W.2d at 512-13. Here, Athens concedes the show-up identification was conducted 10-15 minutes after the incident took place. This factor weighs in favor of finding the identification reliable. *Garza*, 633 S.W.2d at 512-13 (stating the show-up identification was reliable when it was performed within a half hour); *Knott*, 513 S.W.3d at 791 (finding the record supported the show-up identification occurred less than an hour following the offense and was reliable).

### b. Totality of the Circumstances

Having viewed the identification under the totality of circumstances and finding the identification to be reliable, we find there was not a substantial likelihood of misidentification even if the show-up was suggestive and unnecessary as Athens claims. *Garza*, 633 S.W.2d at 512-13; *Knott*, 513 S.W.3d at 791. Accordingly, Athens' rights of due process were not violated, and the trial court did not err in denying the motion to suppress. *See Garza*, 633 S.W.2d at 512-13; *see also Knott*, 513 S.W.3d at 791.

For these reasons, Issue Two is overruled.

### B. Confrontation Clause

In his first issue, Athens argues the trial court erred in admitting out-of-court statements of Michelle Arvey, which were admitted over his Confrontation Clause objection through the testimony of Steven Lask. Athens argues Arvey's statements were testimonial and not made during an ongoing emergency. In response, the State contends Athens failed to show Arvey's statements violated the Confrontation Clause because they were not testimonial. The State further argues error, if any, was harmless.

*1. Standard of Review and Applicable Law*

A trial court's decision to admit evidence is reviewed under an abuse of discretion standard. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *Lopez v. State*, 615 S.W.3d 238, 267 (Tex. App.—El Paso 2020, pet. ref'd). However, if the admission of evidence involves a constitutional legal ruling, we give almost total deference to the trial court's determination of historical facts but review *de novo* the application of those facts. *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010); *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

The United States Constitution and Texas Constitution provide that a defendant has the right to confront witnesses against him. U.S. CONST. amends. VI, XIV; TEX. CONST. art. I, § 10; *Crawford v. Washington*, 541 U.S. 36, 42 (2004). The Confrontation Clause prohibits a witness from recounting a declarant's out-of-court statements that are testimonial unless the declarant is unavailable to testify, and the defendant has a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-54; *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005) (Confrontation Clause applies during punishment phase of trial). Once a defendant objects to the admission of out-of-court statements under *Crawford*, the burden shifts to the State, as the proponent of the evidence, to establish the admissibility of the evidence under *Crawford*. *De La Paz v. State*, 273 S.W.3d 671, 680-81 (Tex. Crim. App. 2008).

Although we defer to a trial court's determination of historical facts and credibility, we review *de novo* a claim of Confrontation Clause violation. *Wall*, 184 S.W.3d at 742. "This is particularly so because the legal ruling of whether a statement is testimonial under *Crawford* is determined by the standard of an objectively reasonable declarant standing in the shoes of the actual declarant." *Id*. at 742-43. There are three types of testimonial statements: (1) ex parte in-

court testimony such as pretrial statements made with the expectation to be used procedurally; (2) formalized testimonial statements contained in affidavits, depositions, or prior testimony; (3) statements made under circumstances that would lead an objective witness to reasonably believe the statement would be available for use at a later trial. *Langham*, 305 S.W.3d at 576. Essentially, a statement is testimonial if, viewed objectively, the primary purpose of the statement was to create an out-of-court substitute for trial testimony. *Ohio v. Clark*, 576 U.S. 237, 245 (2015).

*2. Analysis*

During the punishment phase of trial, the State sought to introduce extraneous offense testimony from Steven Lask. At the start of questioning, the prosecutor asked Lask to describe events of September 20, 2015.[2] Lask testified, at about 5 p.m., he and his wife were walking from their home to visit a friend who lived in their neighborhood. As they rounded a corner, Lask heard screeching tires and "an unnatural sound of a vehicle at high RPMs," along with the sound of a car bottoming out on a large rock. He saw a vehicle traveling north and turning left. After he checked on his wife, he then walked up towards the area where the car had just left to make sure there had not been an accident or someone injured. Lask saw three individuals standing outside a house appearing "a little bit disturbed or stressed out." There were two females and one male. Lask grew more concerned when he saw that one of the two women, later identified as Michelle Arvey, was covered in blood. Lask described, "I kind of engaged them to make sure that everyone was okay." Initially, he thought Arvey seemed to be in shock because she was not very vocal and kept to

---

[2] From our record, it appears the prosecutor misspoke and intended to ask about events of December 20, 2015, not September 20, 2015. We note the State's notice of extraneous offenses describes an alleged murder, on December 20, 2015, against Hector Jimenez. Additional witnesses who testified to events pertaining to an extraneous murder offense all referenced the date of December 20, 2015.

13

herself. As he talked with the other two individuals, Arvey soon became vocal and answered questions. Lask next called 911. After giving preliminary information, he passed the phone to the individuals but remained present during the call.

As the State asked Lask to describe what statements Arvey made while she was in an emotional state as he had earlier described, defense counsel objected on grounds of hearsay and Confrontation Clause violation. The State responded the exceptions of excited utterance and present sense impression applied as exceptions to hearsay; and statements from Arvey were made in an ongoing emergency, not for testimonial purposes. The trial court overruled Athens' objections.

Lask testified Arvey had described the situation that had just happened to her. Providing further details, he testified:

> She talked about they were taking someone to a place, and then her, I think, fiancé was shot, and then she was taken to her sister's house, in which she used as a diversion to get out of the vehicle that she was in. At which point, someone took off, and I'm assuming that was the caller that I saw take off from the scene.

The State then asked Lask whether Arvey described whether she was related to the other person in the car who was *not* shot. Lask answered, "Her son." Lask further described he believed Arvey stated her son's name was Daniel. He also testified that Arvey mentioned her fiancé Hector was the third person who was in the car with her.

On appeal, Athens argues that, after Lask had become aware that a shooting had occurred, he elicited Arvey's out-of-court statements to identify the alleged perpetrator and communicate that information to law enforcement. He argues, "Arvey's answer did not seek to answer why, where, or when the shooting had occurred, nor did Arvey provide information about where the alleged shooter was going." Athens further contends the surrounding circumstances described by

14

Lask—who had testified he was then serving as a captain in the U.S. Army—objectively indicate the primary purpose of his interview of Arvey was to obtain information about an alleged offense which was then reported in a 911 call. After reviewing Lask's testimony, we disagree.

Here, Lask described he had simply been walking in the neighborhood with his wife on their way to visit a friend. The surrounding circumstances of his testimony show that Lask approached Arvey only after hearing screeching tires and being concerned that persons in the area may need assistance. Lask testified the noise of the vehicle caused him first to check on his wife before he went to check on others in the area. As he approached three individuals standing outside a home, he first noted they appeared distressed with one being covered in blood. Lask described that Arvey's statements were made to him after she had exited from the same vehicle that had caught his attention, and she claimed she had escaped only after creating a diversion. It was during this interaction that Arvey described what had happened to her. Given these surrounding circumstances, Lask described a situation taking place during an ongoing emergency while he gave assistance to neighbors who appeared distressed and one of them even appeared to be covered in blood. *See Lopez v. State*, 615 S.W.3d 238, 268 (Tex. App.—El Paso 2020, pet. ref'd) (finding an ongoing emergency when officer was dispatched to a "shots fired" call, the scene was chaotic, the officer had a concern of someone with a gun, and a witness waived him over to give information on the shooter); *Rodriguez v. State*, 274 S.W.3d 760, 765 (Tex. App.—San Antonio 2008, no pet.) (finding statements not testimonial when officer arrived at the scene to a woman in obvious distress).

Moreover, the statements were made to Lask as a bystander who had been walking in the neighborhood, not as a member of law enforcement. "Statements made to someone who is not

15

principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Clark*, 576 U.S. at 249. The comments by Arvey disclosed by Lask focused on what had just occurred as she described her escape from a vehicle that had screeched its tires and sped from the scene. *Clark*, 576 U.S. at 244; *see also Rodriguez*, 274 S.W.3d at 765 (stating statements produced from questions objectively designed to determine what happened and assess the situation). Additionally, other than calling 911 to report an emergency, neither Arvey nor Lask displayed a desire to formally preserve the utterances by creating a written statement or making a verbal recording to be used in trial at a later time. *Avant v. State*, 499 S.W.3d 123, 129 (Tex. App.—San Antonio 2016, no pet.) (finding statements by a woman to her daughter while she was scared and distressed were not made to create a substitute for trial testimony but out of fear for her safety).

On this record, we hold the statements made by Arvey to Lask were not testimonial in nature because their primary purpose was not to create an out-of-court substitute for trial testimony. *Clark*, 576 U.S. at 245; *see also Lopez*, 615 S.W.3d at 268 (holding statements not testimonial when primary purpose was not to create an out-of-court substitute for trial testimony but made to address an ongoing emergency).

And we further note that, even if Arvey's out-of-court statements could be considered testimonial in nature, Athens has failed to show that he suffered harm from the trial court's admission of such statements. When reviewing whether an error in admitting out-of-court statements in violation of *Crawford* is harmless beyond a reasonable doubt we must consider: "(1) The importance of the hearsay statements to the State's case; (2) Whether the hearsay evidence was cumulative of other evidence; (3) The presence or absence of evidence corroborating or

16

contradicting the hearsay testimony on material points; and (4) The overall strength of the prosecution's case." *Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006). We may consider other factors, but we must find, in context of the entire trial, that the admission of the testimony would probably not have had a significant impact on the mind of an average juror. *Id.* at 853.

Although the testimony by Lask was important and relevant to the State's punishment case in that he interacted with Arvey immediately after the shooting of her fiancé and prior to her 911 report, the testimony by Lask was not the main evidence relied on by the State to establish Athens' involvement in the incident. Lask's testimony was cumulative of other unobjected-to evidence which was received from other bystanders who had witnessed events earlier in the day which all connected Athens to the alleged extraneous offense. For example, there was evidence from a bystander who saw Athens throwing the victim out of the vehicle and onto the ground, Athens forcing Arvey back into the vehicle and leaving, and stating the man he found lying on the ground "was dead . . . his heart wasn't beating." Also, there was testimony from a man who knew the victim and saw the victim with Athens and Arvey right before his body was found. Additionally, there was evidence from a bystander who saw Athens and Arvey fighting before Athens forced Arvey into the vehicle, left, and saw "a gentleman on the floor after he took off."

The witnesses gave descriptions of the people they witnessed, the vehicle that fled the scene, and one who testified to the license plate number of the vehicle. Multiple officers testified to arriving on scene after a reported shooting, arriving to the hospital where the victim was transported to, and conducting an initial investigation. There was also evidence from the detective who located the vehicle that fled from the scene—describing it contained blood transfer on the

outside, blood on the driver's side headrest, and a firearm in the backseat—and the detective's attempt to locate Athens as the suspect. Lastly, the State admitted, without objection, the autopsy report reflecting the decedent received a gunshot wound to the head.

The evidence introduced by the State during the punishment phase of trial all corroborated the statements made by Arvey reflecting her fiancé was shot in the car and Athens was present. Lastly, the State's case as to the extraneous offense was strong in that it established an extraneous crime or bad act that was shown beyond a reasonable doubt by evidence to have been committed by Athens or for which he could be held criminally responsible. We also note the State introduced five other extraneous offenses during the punishment phase of trial, including three prior convictions. From our review of the record, even if the trial court erred in admitting Arvey's out-of-court statements in violation of *Crawford*, we otherwise would find the error was harmless beyond a reasonable doubt. *Langham v. State*, 331 S.W.3d 87, 91 (Tex. App.—Eastland 2010, pet. ref'd); *Davis*, 203 S.W.3d at 856.

For these reasons, Athens' first issue is overruled.

### C. Victim Impact Evidence

In presenting his third issue, Athens complains the trial court erred in admitting improper, extraneous offense victim impact evidence during the punishment phase. Athens complains of testimony from Marisa Carbajal Moller (Carbajal) regarding an alleged aggravated assault with a deadly weapon while Carbajal was pregnant; and aggravated assault with a deadly weapon which caused Carbajal to have a miscarriage. Despite having drafted his third issue broadly in the list of issues presented, Athens' briefing of the issue more narrowly complains of Carbajal's testimony about her pregnancy and related miscarriage, but no complaint is made of similar testimony she

18

gave about all the other injuries she sustained during the alleged assault.

The State counters the evidence complained of, by its very nature, may not be viewed as impermissible, victim impact evidence. Rather, the State contends Carbajal merely described a permissible impact of extraneous offenses which Athens had committed against her.

*1. Standard of Review*

We review the trial court's admission or exclusion of evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Under this standard, the trial court's decision will be upheld as long as it falls with the zone of reasonable disagreement. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). "If the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed, even if the trial judge gave the wrong reason for his correct ruling." *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011).

*2. Applicable Law*

In relevant part, the Code of Criminal Procedure of Texas provides:

> Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1).

By its terms, article 37.07 permits the admission of extraneous crimes or bad acts committed by the defendant in the punishment phase of trial, whether the defendant has been

19

previously charged or finally convicted of such crime or act, for the purpose of assessing punishment. *Id*; *see also Smith v. State*, 577 S.W.3d 548, 551 (Tex. Crim. App. 2019); *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997).

When determining admissibility of article 37.07 evidence, a court is guided by the statute's language. *Haley*, 173 S.W.3d at 514. For purposes of assessing punishment, the State may offer evidence of any extraneous crime or bad act that is shown, beyond a reasonable doubt, either to have been (1) an act committed by the defendant or (2) an act for which he could be held criminally responsible. *Id*. Ordinarily, the trial judge has wide latitude in determining what evidence is relevant, including acts occurring before or after the charged offense. *Espinosa v. State*, 194 S.W.3d 703, 709 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

Relevant evidence is defined as evidence that has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *See* TEX. R. EVID. 401. Evidence that is not relevant is not admissible. TEX. R. EVID. 402. Determining what is relevant is "a question of what is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case." *Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999). Yet, "[e]ven if relevant to the determination of a defendant's sentence, evidence may be excluded on grounds that its probative value is substantially outweighed by the danger of unfair prejudice." *Espinosa*, 194 S.W.3d at 709. Rule 403 of the Texas Rules of Evidence carries a presumption that relevant evidence must be more probative than prejudicial. *Jones v. State,* 944 S.W.2d 642, 652 (Tex. Crim. App. 1996). Evidence should be excluded only when there exists a clear disparity between the danger of unfair

20

prejudice and the probative value of the evidence. *Jones,* 944 S.W.2d at 652. To be unfairly prejudicial, there must be "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *Rogers,* 991 S.W.2d at 266.

The trial court exercises discretion in admitting victim impact evidence, while appropriately limiting the amount and scope of such evidence. *Salazar v. State,* 90 S.W.3d 330, 336 (Tex. Crim. App. 2002). When considering the admissibility of victim impact testimony, trial courts must consider such factors as: (1) how probative is the evidence; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Salazar,* 90 S.W.3d at 336 (citing *Solomon v. State,* 49 S.W.3d 356, 366 (Tex. Crim. App. 2001) and *Reese v. State,* 33 S.W.3d 238, 240 (Tex. Crim. App. 2000)). By its nature, victim impact evidence is designed to remind the jury of the foreseeable consequences the crime has on the community and the victim's family and friends. *Id.* at 335. Ordinarily, relevant victim impact evidence may include the physical, psychological, or economic effects of a crime on the victim or the victim's family. *See Stavinoha v. State,* 808 S.W.2d 76, 79 (Tex. Crim. App. 1991).

*3. Analysis*

During the punishment phase, the State sought to introduce testimony from Carbajal in which she alleged Athens had committed an aggravated assault against her on December 20, 2015. At the time of the incident, Athens and Carbajal were in a dating relationship. She testified, however, that he came to her home uninvited, around midnight. Because she was afraid of him, she locked herself in her room and called the police. Athens knocked down the door and punched her in the face. Next, he forced her to try and open a safe she had in her closet. When she could

21

not open it, he threw it towards her, hitting her in the head. After he demanded she remove her clothes, he then beat her with a broomstick and eventually held a knife to her neck. When she screamed for him to stop, he told her she was going to die that night.

As the ordeal continued, he told her to get dressed, and made her write down her PIN number. He then forced her into her vehicle and drove up the street with excessive speed. Soon, he crashed the vehicle into a parked car, causing the air bag to deploy. Although neighbors reacted to the crash, Carbajal warned them to go back inside because Athens continued to threaten her with a knife. Athens then forced her back into her home where he beat her with a metal frame from a mirror and repeatedly threatened to kill her. When Athens saw flashing lights from responding firemen, he ran out through the back of the house while she ran to safety through the front.

Carbajal testified her injuries from the incident included multiple bruises, a fracture, a gash on her side, a dislocated shoulder, a torn ligament, and bruised and swollen hands. Along with her testimony, the State admitted multiple photographs depicting Carbajal's injuries. Before she was assaulted, Carbajal described she had told Athens she missed her period and needed a pregnancy test. Following the assault by Athens, as she received treatment for her injuries, she only then learned for a fact that she was pregnant at the time of the assault. She further testified she lost her pregnancy due to her injuries.

On appeal, Athens concedes that victim impact evidence may include physical, psychological, or economic effects of a crime on a victim or a victim's family. *See Stavinoha*, 808 S.W.2d at 79; *Espinosa*, 194 S.W.3d at 710-11. But even so, he points out that Carbajal was neither a victim of the underlying case for which he was found guilty nor was she otherwise named in the indictment. Athens complains of testimony of Carbajal's pregnancy, and her related miscarriage,

asserting the testimony was inadmissible victim impact evidence given "[t]his evidence was not necessary for the prosecution to prove the injuries sustained by Carbajal." We disagree.

Without objection, Carbajal testified to a wide range of impacts from the assault including multiple bruises, scratches, a gash on her side, dislocation of her shoulder, a torn ligament, and a fracture in her hands. The evidence of Carbajal's pregnancy and miscarriage was no less relevant to show her physical state both during and after the offense. *Smith v. State*, No. 05-03-01275-CR, 2004 WL 2341248, at \*5 (Tex. App.—Dallas Oct. 19, 2004, pet. ref'd) (not designated for publication). By definition, "victim impact evidence," which is impermissible, "is evidence of the effect of an offense on people *other* than the victim." *See Roberts*, 220 S.W.3d at 531 (holding testimony from the victim of the emotional impact an extraneous robbery appellant committed had on her life was not victim impact evidence); *Smith v. State*, 238 S.W.3d 512, 515 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding evidence by victim to her being emotionally affected by appellant's violence against her is not victim impact evidence because she was the victim of the extraneous assault); *Martinez v. State*, No. 10-16-00397-CR, 2018 WL 2142742, at \*9 (Tex. App.—Waco May 9, 2018, no pet.) (mem. op., not designated for publication) (holding victim's testimony during punishment phase on the effect appellant's sexual assault against her had on her was not victim impact testimony because it was a different offense for which she was the victim). Beyond testimony from Carbajal herself as the victim of Athens' extraneous bad act, no third-party testified about the effect on them of such incident. *See Mays v. State*, 318 S.W.3d 368, 393 (Tex. Crim. App. 2010). Pursuant to Article 37.07, § 3(a)(1) of the Code of Criminal Procedure, we cannot conclude the trial court abused its discretion by admitting the complained-of testimony, as it was relevant to sentencing and was not inadmissible victim impact evidence. And while the

23

evidence was prejudicial, Athens has not shown it was unfairly prejudicial in the context of the case. Tex. R. Evid. 403.

For these reasons, Athens' third issue is overruled.

### III.  CONCLUSION

We affirm the judgment of the trial court.


GINA M. PALAFOX, Justice

July 30, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)